IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NOKIA TECHNOLOGIES OY, | ) | |
| | ) | |
| Plaintiff, | ) | **REDACTED - PUBLIC VERSION** |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 25-1337 (GBW) |
| WARNER BROS. ENTERTAINMENT INC., | ) | |
| WARNER BROS. DISCOVERY, INC., and | ) | **DEMAND FOR JURY TRIAL** |
| HOME BOX OFFICE, INC., | ) | |
| | ) | ████████████████████ |
| Defendants. | ) | ████ |
| _____ | ) | |
| WARNER BROS. ENTERTAINMENT | ) | |
| INC., WARNER BROS. DISCOVERY, | ) | |
| INC., and WARNERMEDIA DIRECT, | ) | |
| LLC, | ) | |
| | ) | |
| Counterclaim Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NOKIA CORPORATION, NOKIA | ) | |
| TECHNOLOGIES OY, and NOKIA OF | ) | |
| AMERICA CORPORATION, | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

## DEFENDANTS' ANSWER AND DEFENSES TO PLAINTIFF'S COMPLAINT AND COUNTERCLAIM PLAINTIFFS' COUNTERCLAIMS

Warner Bros. Entertainment Inc., Warner Bros. Discovery, Inc., and Home Box Office, Inc. ("Warner Bros." or "Defendants"), by and through their attorneys, hereby submit their Answer, Defenses, and Counterclaims to the Complaint filed by Plaintiff Nokia Technologies Oy ("Nokia" or "Plaintiff") (D.I. 1). The paragraph numbers in this Answer correspond to the paragraph numbers in the Complaint. For convenience and clarity purposes only, Defendants will also use the same headings as set forth in the Complaint. In doing so, Defendants do not admit any of the

allegations contained in Nokia's headings. All allegations of the Complaint not expressly admitted in this Answer are denied.

## NATURE OF THE ACTION

1.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1 and therefore deny them.

2.     Defendants admit that Nokia alleges ownership of patents that include claims related to video decoding and encoding, but Defendants deny that they have committed or are committing acts of infringement in this District or elsewhere with respect to the Asserted Patents. Defendants admit that the second sentence of Paragraph 2 provides a generally accurate high-level description of how encoding differs from decoding. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 2 and therefore deny them.

3.     Defendants deny all allegations of Paragraph 3.

4.     Defendants deny all allegations of Paragraph 4.

5.     Defendants deny all allegations of Paragraph 5.

## PARTIES

6.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6 and therefore deny them.

7.     Warner Bros. Entertainment Inc. admits the allegations of Paragraph 7.

8.     Warner Bros. Entertainment Inc. admits the allegations of Paragraph 8.

9.     Warner Bros. Discovery, Inc. admits the allegations of Paragraph 9.

10.    Warner Bros. Discovery, Inc. admits the allegations of Paragraph 10.

11.    Home Box Office, Inc. admits the allegations of Paragraph 11.

12.    Home Box Office, Inc. admit the allegations of Paragraph 12.

## JURISDICTION AND VENUE

13.    The allegations in Paragraph 13 are conclusions of law to which no response is required. To the extent that a response may be required, Defendants do not contest, for purposes of this case only, that this Court has federal jurisdiction over cases involving claims of patent infringement, but deny that they have committed any acts of infringement, in this District or elsewhere. The remaining allegations in Paragraph 13 are denied.

14.    The allegations in Paragraph 14 are conclusions of law to which no response is required. To the extent that a response may be required, Defendants do not contest, for purposes of this case only, that this Court has federal jurisdiction over Plaintiff's claims in this case. The remaining allegations in Paragraph 14 are denied.

15.    The allegations in Paragraph 15 are conclusions of law to which no response is required. To the extent that a response may be required, Defendants do not contest, for purposes of this case only, that this Court has federal jurisdiction over Plaintiff's claims in the case. The remaining allegations in Paragraph 15 are denied.

16.    Defendants admit that Warner Bros. Entertainment, Inc. is incorporated in Delaware and has appointed The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801, as a registered agent for service of process. The remaining allegations in Paragraph 16 state a conclusion of law to which no response is required. To the extent that a response may be required, Defendants do not contest, for purposes of this case only, that this Court has personal jurisdiction over Warner Bros. Entertainment, Inc. The remaining allegations in Paragraph 16 are denied.

17.    Defendants admit that Warner Bros. Discovery, Inc. is incorporated in Delaware and has appointed Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808, as a registered agent for service of process. The remaining allegations in Paragraph 17 state

a conclusion of law to which no response is required. To the extent that a response may be required, Defendants do not contest, for purposes of this case only, that this Court has personal jurisdiction over Warner Bros. Discovery, Inc. The remaining allegations in Paragraph 17 are denied.

18.     Defendants admit that Home Box Office, Inc. is incorporated in Delaware and has appointed The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801, as a registered agent for service of process. The remaining allegations in Paragraph 18 state a conclusion of law to which no response is required. To the extent that a response may be required, Defendants do not contest, for purposes of this case only, that this Court has personal jurisdiction over Home Box Office, Inc. The remaining allegations in Paragraph 18 are denied.

19.     Defendants deny all allegations of Paragraph 19.

20.     Defendants deny all allegations of Paragraph 20.

21.     Defendants admit they conduct business in the state of Delaware. All remaining allegations in Paragraph 21 are conclusions of law to which no response is required. To the extent that a response may be required, Defendants do not contest, for purposes of this case only, that this Court has personal jurisdiction over Defendants. The remaining allegations in Paragraph 21 are denied.

22.     Defendants deny all allegations of Paragraph 22.

23.     Defendants deny all allegations of Paragraph 23.

24.     Defendants do not contest, for purposes of this case only, that venue is proper in this District. Defendants deny the remaining allegations of Paragraph 24, and specifically deny that they have committed any acts of infringement, in this District or elsewhere.

## I.    NOKIA'S INVESTMENT IN VIDEO CODING TECHNOLOGY AND RESULTING PATENT CLAIMS

25.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25 and therefore deny them.

26.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26 and therefore deny them.

27.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 27 and therefore deny them. Defendants deny the allegations in the second sentence of Paragraph 27.

## II.    THE ITU'S COMMON PATENT POLICY

28.    Defendants admit that the ITU is the United Nations specialized agency for information and communication technologies and that the ITU-T is a sector within the ITU focused on developing international standards, which it refers to as "Recommendations." Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 28 and therefore deny them.

29.    Defendants admit that the ITU-T and ISO published the H.264 Standard (also known as "MPEG-4 part 10" or "Advanced Video Coding") and that the VCEG, JVT, and MPEG were involved in its development process. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 29 and therefore deny them.

30.    Defendants admit that the JCT-VC worked on the H.265 Standard (also known as "MPEG-H Part 2" or "High Efficiency Video Coding"), which is a video coding standard intended to be the successor to the widely implemented H.264 Standard. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 30 and therefore deny them.

31.     Defendants admit that the ITU developed the "Common Patent Policy." The terms of the Common Patent Policy and the obligations resulting therefrom speak for themselves. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 31 and therefore deny them.

32.     Defendants admit that the ITU, International Organization for Standardization, and the International Electrotechnical Commission published "Guidelines for Implementation of the Common Patent Policy for ITU-T/ITU-R/ISO/IEC" in December 2022.  The Guidelines speak for themselves and Defendants deny the allegations in Paragraph 32 to the extent inconsistent therewith. Defendants deny that a document entitled "Guidelines for Implementation of the Common Patent Policy for ITU-T/ITU-R/ISO/IEC" is available at https://www.itu.int/itudoc/itut/patents/policy/guide.pdf. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 32, and therefore deny them.

33.     Defendants state that "Guidelines for Implementation of the Common Patent Policy for ITU-T/ITU-R/ISO/IEC" speaks for itself and deny the allegations in Paragraph 33 to the extent inconsistent therewith. Defendants deny that a document entitled "Common Patent Policy for ITU-T/ITU-R/ISO/IEC" is available at https://www.itu.int/en/ITUT/ipr/Pages/policy.aspx. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 33, and therefore deny them.

34.     Defendants state that "Guidelines for Implementation of the Common Patent Policy for ITU-T/ITU-R/ISO/IEC" and the "Patent Statement and Licensing Declaration Form" speak for themselves and deny the allegations in Paragraph 34 to the extent inconsistent therewith. Defendants deny that a document entitled "Guidelines for Implementation of the Common Patent

Policy for ITU-T/ITU-R/ISO/IEC" is available at https://www.itu.int/itudoc/itut/patents/policy/guide.pdf. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 34, and therefore deny them.

35.    Defendants state the terms of the Common Patent Policy speak for themselves, and deny the allegations in Paragraph 35 to the extent inconsistent therewith. The remaining allegations in Paragraph 35 are denied.

36.    Defendants state that the H.264 Recommendation/Standard speaks for itself and deny the allegations in Paragraph 36 to the extent inconsistent therewith. The remaining allegations in Paragraph 36 are denied.

37.    Defendants state that the H.264 Recommendation/Standard speaks for itself and deny the allegations in Paragraph 37 to the extent inconsistent therewith. The remaining allegations in Paragraph 37 are denied.

38.    Defendants state that the H.265 Recommendation/Standard speaks for itself and deny the allegations in Paragraph 38 to the extent inconsistent therewith. The remaining allegations in Paragraph 38 are denied.

39.    Defendants admit that Nokia filed declarations in which it committed to grant licenses for its decoding patent claims on RAND terms and conditions, but deny the implication that Nokia did not commit to grant licenses for its encoding patent claims on RAND terms and conditions. Defendants deny that in all relevant instances Nokia timely notified the ITU and its participants of its relevant patent rights and deny that Nokia complied with the ITU Common Patent Policy. Defendants state that Nokia's Patent Statement and Licensing Declarations submitted to the ITU speak for themselves and deny the allegations in Paragraph 39 to the extent

inconsistent therewith. Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 39, and therefore deny them.

40.     Paragraph 40 states conclusions of law to which no response is required, and they are denied to the extent a response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 40 and therefore deny them.

### III. NOKIA'S NEGOTIATIONS WITH WARNER BROS.

41.     Defendants admit Nokia reached out to Defendants in late 2022 but deny that Defendants have committed or are committing acts of infringement in this District or elsewhere with respect to the Asserted Patents. The remaining allegations in Paragraph 41 are denied.

42.     Defendants deny all allegations of Paragraph 42.

43.     Paragraph 43 states conclusions of law to which no response is required. To the extent a response is required, Defendants admit that on February 17, 2023, Nokia sent Defendants a document whose contents speak for themselves, and Defendants deny the allegations in Paragraph 43 to the extent inconsistent therewith.

44.     Defendants admit that Nokia took the position that its encoding patent claims are not essential to the H.264 and/or H.265 Standards and are thus not RAND encumbered or otherwise governed by the ITU's Common Patent Policy. Defendants admit that they did not and do not agree with Nokia's position that Nokia's declared-essential and actually-essential encoding patent claims are not RAND encumbered or otherwise governed by the ITU's Common Patent Policy. The remaining allegations in Paragraph 44 are denied.

45.     Defendants admit that they contend that Nokia's declared-essential and actually-essential encoding patent claims are RAND encumbered and governed by the ITU's Common Patent Policy. Defendants deny all remaining allegations in Paragraph 45.

46.     Defendants admit that they have not accepted Nokia's offers. Defendants deny all remaining allegations in Paragraph 46.

47.     Defendants deny the allegations in Paragraph 47.

## IV. NOKIA ASSERTED PATENTS

48.     To the extent the allegations in Paragraph 48 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48 and therefore deny them.

### A.  U.S. Patent No. 7,532,808

49.     Defendants admit that U.S. Patent No. 7,532,808 (the "'808 Patent") is titled "Method for Coding Motion in a Video Sequence." Defendants admit that a purported copy of the '808 Patent is attached as Exhibit 1 to the Complaint. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 49, and therefore deny them.

50.     To the extent the allegations in Paragraph 50 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50, and therefore deny them.

51.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51, and therefore deny them.

52.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 52, and therefore deny them.

53.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53, and therefore deny them.

54.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54, and therefore deny them.

55.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 55, and therefore deny them.

56.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 56, and therefore deny them.

57.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 57, and therefore deny them.

58.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 58, and therefore deny them.

59.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 59, and therefore deny them.

60.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 60, and therefore deny them.

61.     To the extent the allegations in Paragraph 61 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 61, and therefore deny them.

**B. U.S. Patent No. 6,950,469**

62.     Defendants admit that U.S. Patent No. 6,950,469 (the "'469 Patent") is titled "Method for Sub-Pixel Value Interpolation." Defendants admit that a purported copy of the '469 Patent is attached as Exhibit 2 to the Complaint. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 62, and therefore deny them.

63.     To the extent the allegations in Paragraph 63 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 63, and therefore deny them.

64.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 64, and therefore deny them.

65.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 65, and therefore deny them.

66.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 66, and therefore deny them.

67.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 67, and therefore deny them.

68.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 68, and therefore deny them.

69.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 69, and therefore deny them.

70.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 70, and therefore deny them.

71.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 71, and therefore deny them.

72.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 72, and therefore deny them.

73.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 73, and therefore deny them.

74.     To the extent the allegations in Paragraph 74 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 74, and therefore deny them.

### C.  U.S. Patent No. 8,175,148

75.    Defendants admit that U.S. Patent No. 8,175,148 (the "'148 Patent") is titled "Method and Device for Indicating Quantizer Parameters in a Video Coding System." Defendants admit that a purported copy of the '148 Patent is attached as Exhibit 3 to the Complaint. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 75, and therefore deny them.

76.    To the extent the allegations in Paragraph 76 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 76, and therefore deny them.

77.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 77, and therefore deny them.

78.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 78, and therefore deny them.

79.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 79, and therefore deny them.

80.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 80, and therefore deny them.

81.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 81, and therefore deny them.

82.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 82, and therefore deny them.

83.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 83, and therefore deny them.

84.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 84, and therefore deny them.

85.    To the extent the allegations in Paragraph 85 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 85, and therefore deny them.

**D.    U.S. Patent No. 8,050,321**

86.    Defendants admit that U.S. Patent No. 8,050,321 (the "'321 Patent") is titled "Grouping of Image Frames in Video Coding." Defendants admit that a purported copy of the '321 Patent is attached as Exhibit 4 to the Complaint. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 86, and therefore deny them.

87.    To the extent the allegations in Paragraph 87 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 87, and therefore deny them.

88.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 88, and therefore deny them.

89.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 89, and therefore deny them.

90.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 90, and therefore deny them.

91.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 91, and therefore deny them.

92.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 92, and therefore deny them.

93.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 93, and therefore deny them.

94.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 94, and therefore deny them.

95.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 95, and therefore deny them.

96.     To the extent the allegations in Paragraph 96 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96, and therefore deny them.

**E.  U.S. Patent No. 7,289,674**

97.     Defendants admit that U.S. Patent No. 7,289,674 (the "'674 Patent") is titled "Spatial Prediction Based Intra Coding." Defendants admit that a purported copy of the '674 Patent is attached as Exhibit 5 to the Complaint. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 97, and therefore deny them.

98.     To the extent the allegations in Paragraph 98 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 98, and therefore deny them.

99.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 99, and therefore deny them.

100.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 100, and therefore deny them.

101.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 101, and therefore deny them.

102.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 102, and therefore deny them.

103.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 103, and therefore deny them.

104.    To the extent the allegations in Paragraph 104 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 104, and therefore deny them.

**F.  U.S. Patent No. 6,968,005**

105.    Defendants admit that U.S. Patent No. 6,968,005 (the "'005 Patent") is titled "Video Coding." Defendants admit that a purported copy of the '005 Patent is attached as Exhibit 6 to the Complaint. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 105, and therefore deny them.

106.    To the extent the allegations in Paragraph 106 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 106, and therefore deny them.

107.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 107, and therefore deny them.

108.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 108, and therefore deny them.

109.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 109, and therefore deny them.

110.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 110, and therefore deny them.

111.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 111, and therefore deny them.

112.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 112, and therefore deny them.

113.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 113, and therefore deny them.

114.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 114, and therefore deny them.

115.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 115, and therefore deny them.

116.    To the extent the allegations in Paragraph 116 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 116, and therefore deny them.

**G.  U.S. Patent No. 6,711,211**

117.    Defendants admit that U.S. Patent No. 6,711,211 (the "'211 Patent") is partially titled "Method for Encoding and Decoding Video Information," but state that the full title is "Method for Encoding and Decoding Video Information, A Motion Compensated Video Encoder and a Corresponding Decoder." Defendants admit that a purported copy of the '211 Patent is attached as Exhibit 7 to the Complaint. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 117, and therefore deny them.

118.    To the extent the allegations in Paragraph 118 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 118, and therefore deny them.

119.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 119, and therefore deny them.

120.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 120, and therefore deny them.

121.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 121, and therefore deny them.

122.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 122, and therefore deny them.

123.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 123, and therefore deny them.

124.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 124, and therefore deny them.

125.    To the extent the allegations in Paragraph 125 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 125, and therefore deny them.

**H.  U.S. Patent No. 8,005,145**

126.    Defendants admit that U.S. Patent No. 8,005,145 (the "'145 Patent") is titled "Method and Apparatus for Transferring Video Frame in Telecommunication System." Defendants admit that a purported copy of the '145 Patent is attached as Exhibit 8 to the Complaint. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 126, and therefore deny them.

127.    To the extent the allegations in Paragraph 127 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 127, and therefore deny them.

128.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 128, and therefore deny them.

129.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 129, and therefore deny them.

130.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 130, and therefore deny them.

131.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 131, and therefore deny them.

132.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 132, and therefore deny them.

133.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 133, and therefore deny them.

134.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 134, and therefore deny them.

135.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 135, and therefore deny them.

136.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 136, and therefore deny them.

137.    To the extent the allegations in Paragraph 137 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 137, and therefore deny them.

**I.  U.S. Patent No. 9,800,891**

138.    Defendants admit that U.S. Patent No. 9,800,891 (the "'891 Patent") is titled "Method and Associated Device for Filtering Digital Video Images." Defendants admit that a

purported copy of the '891 Patent is attached as Exhibit 9 to the Complaint. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 138, and therefore deny them.

139.    To the extent the allegations in Paragraph 139 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 139, and therefore deny them.

140.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 140, and therefore deny them.

141.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 141, and therefore deny them.

142.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 142, and therefore deny them.

143.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 143, and therefore deny them.

144.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 144, and therefore deny them.

145.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 145, and therefore deny them.

146.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 146, and therefore deny them.

147.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 147, and therefore deny them.

148.    To the extent the allegations in Paragraph 148 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 148, and therefore deny them.

**J.  U.S. Patent No. 6,856,701**

149.    Defendants admit that U.S. Patent No. 6,856,701 (the "'701 Patent") is titled "Method and System for Context-Based Adaptive Binary Arithmetic Coding." Defendants admit that a purported copy of the '701 Patent is attached as Exhibit 10 to the Complaint. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 149, and therefore deny them.

150.    To the extent the allegations in Paragraph 150 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 150, and therefore deny them.

151.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 151, and therefore deny them.

152.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 152, and therefore deny them.

153.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 153, and therefore deny them.

154.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 154, and therefore deny them.

155.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 155, and therefore deny them.

156.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 156, and therefore deny them.

157.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 157, and therefore deny them.

158.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 158, and therefore deny them.

159.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 159, and therefore deny them.

160.    To the extent the allegations in Paragraph 160 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 160, and therefore deny them.

**K.  U.S. Patent No. 8,107,744**

161.    Defendants admit that U.S. Patent No. 8,107,744 (the "'744 Patent") is titled "Picture Buffering for Prediction References and Display." Defendants admit that a purported copy of the '744 Patent is attached as Exhibit 11 to the Complaint. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 161, and therefore deny them.

162.    To the extent the allegations in Paragraph 162 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 162, and therefore deny them.

163.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 163, and therefore deny them.

164.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 164, and therefore deny them.

165.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 165, and therefore deny them.

166.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 166, and therefore deny them.

167.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 167, and therefore deny them.

168.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 168, and therefore deny them.

169.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 169, and therefore deny them.

170.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 170, and therefore deny them.

171.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 171, and therefore deny them.

172.    To the extent the allegations in Paragraph 172 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 172, and therefore deny them.

**L. U.S. Patent No. 9,571,833**

173.    Defendants admit that U.S. Patent No. 9,571,833 (the "'833 Patent") is titled "Method for Coding and an Apparatus." Defendants admit that a purported copy of the '833 Patent is attached as Exhibit 12 to the Complaint. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 173, and therefore deny them.

174.    To the extent the allegations in Paragraph 174 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 174, and therefore deny them.

175.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 175, and therefore deny them.

176.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 176, and therefore deny them.

177.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 177, and therefore deny them.

178.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 178, and therefore deny them.

179.    To the extent the allegations in Paragraph 179 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 179, and therefore deny them.

**M. U.S. Patent No. 10,523,960**

180.    Defendants admit that U.S. Patent No. 10,523,960 (the "'960 Patent") is titled "Motion Prediction in Video Coding." Defendants admit that a purported copy of the '960 Patent is attached as Exhibit 13 to the Complaint. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 180, and therefore deny them.

181.    To the extent the allegations in Paragraph 181 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 181, and therefore deny them.

182.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 182, and therefore deny them.

183.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 183, and therefore deny them.

184.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 184, and therefore deny them.

185.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 185, and therefore deny them.

186.    To the extent the allegations in Paragraph 186 are conclusions of law, no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 186, and therefore deny them.

**COUNT I: [ALLEGED] PATENT INFRINGEMENT OF THE '808 PATENT**

187.    Defendants incorporate by reference and restate each and every response to the preceding paragraphs of the Complaint as though fully set forth herein.

188.    Defendants deny all allegations of Paragraph 188.

189.    Defendants deny all allegations of Paragraph 189.

190.    Defendants deny all allegations of Paragraph 190.

191.    Defendants deny all allegations of Paragraph 191.

192.    Defendants admit that Exhibit 14 to the Complaint is a claim chart that purports to analyze claim 1 of the '808 Patent. Defendants deny the allegations found within Exhibit 14 and deny that they have committed or are committing acts of infringement in this District or elsewhere with respect to the Asserted Patents. The remaining allegations in Paragraph 192 are denied.

**COUNT II: [ALLEGED] PATENT INFRINGEMENT OF THE '469 PATENT**

193.    Defendants incorporate by reference and restate each and every response to the preceding paragraphs of the Complaint as though fully set forth herein.

194.    Defendants deny all allegations of Paragraph 194.

195.    Defendants deny all allegations of Paragraph 195.

196.    Defendants deny all allegations of Paragraph 196.

197.    Defendants deny all allegations of Paragraph 197.

198.    Defendants admit that Exhibit 15 to the Complaint is a claim chart that purports to analyze claim 1 of the '469 Patent. Defendants deny the allegations found within Exhibit 15 and deny that they have committed or are committing acts of infringement in this District or elsewhere with respect to the Asserted Patents. The remaining allegations in Paragraph 198 are denied.

**COUNT III: [ALLEGED] PATENT INFRINGEMENT OF THE '148 PATENT**

199.    Defendants incorporate by reference and restate each and every response to the preceding paragraphs of the Complaint as though fully set forth herein.

200.    Defendants deny all allegations of Paragraph 200.

201.    Defendants deny all allegations of Paragraph 201.

202.    Defendants deny all allegations of Paragraph 202.

203.    Defendants deny all allegations of Paragraph 203.

204.    Defendants admit that Exhibit 16 to the Complaint is a claim chart that purports to analyze claim 1 of the '148 Patent. Defendants deny the allegations found within Exhibit 16 and deny that they have committed or are committing acts of infringement in this District or elsewhere with respect to the Asserted Patents. The remaining allegations in Paragraph 204 are denied.

**COUNT IV: [ALLEGED] PATENT INFRINGEMENT OF THE '321 PATENT**

205.    Defendants incorporate by reference and restate each and every response to the preceding paragraphs of the Complaint as though fully set forth herein.

206.    Defendants deny all allegations of Paragraph 206.

207.    Defendants deny all allegations of Paragraph 207.

208.    Defendants deny all allegations of Paragraph 208.

209.    Defendants deny all allegations of Paragraph 209.

210.    Defendants admit that Exhibits 17 and 18 to the Complaint are claim charts that purport to analyze claim 1 of the '321 Patent. Defendants deny the allegations found within Exhibits 17 and 18 and deny that they have committed or are committing acts of infringement in this District or elsewhere with respect to the Asserted Patents. The remaining allegations in Paragraph 210 are denied.

**COUNT V: [ALLEGED] PATENT INFRINGEMENT OF THE '674 PATENT**

211.    Defendants incorporate by reference and restate each and every response to the preceding paragraphs of the Complaint as though fully set forth herein.

212.    Defendants deny all allegations of Paragraph 212.

213.    Defendants deny all allegations of Paragraph 213.

214.    Defendants deny all allegations of Paragraph 214.

215.    Defendants deny all allegations of Paragraph 215.

216.    Defendants admit that Exhibit 19 to the Complaint is a claim chart that purports to analyze claim 1 of the '674 Patent. Defendants deny the allegations found within Exhibit 19 and deny that they have committed or are committing acts of infringement in this District or elsewhere with respect to the Asserted Patents. The remaining allegations in Paragraph 216 are denied.

**COUNT VI: [ALLEGED] PATENT INFRINGEMENT OF THE '005 PATENT**

217.    Defendants incorporate by reference and restate each and every response to the preceding paragraphs of the Complaint as though fully set forth herein.

218.    Defendants deny all allegations of Paragraph 218.

219.    Defendants deny all allegations of Paragraph 219.

220.    Defendants deny all allegations of Paragraph 220.

221.    Defendants deny all allegations of Paragraph 221.

222.    Defendants deny all allegations of Paragraph 222.

223.    Defendants admit that Exhibit 20 to the Complaint is a claim chart that purports to analyze claim 1 of the '005 Patent. Defendants deny the allegations found within Exhibit 20 and deny that they have committed or are committing acts of infringement in this District or elsewhere with respect to the Asserted Patents. The remaining allegations in Paragraph 223 are denied.

**COUNT VII: [ALLEGED] PATENT INFRINGEMENT OF THE '211 PATENT**

224.    Defendants incorporate by reference and restate each and every response to the preceding paragraphs of the Complaint as though fully set forth herein.

225.    Defendants deny all allegations of Paragraph 225.

226.    Defendants deny all allegations of Paragraph 226.

227.    Defendants deny all allegations of Paragraph 227.

228.    Defendants deny all allegations of Paragraph 228.

229.    Defendants admit that Exhibit 21 to the Complaint is a claim chart that purports to analyze claim 1 of the '211 Patent. Defendants deny the allegations found within Exhibit 21 and deny that they have committed or are committing acts of infringement in this District or elsewhere with respect to the Asserted Patents. The remaining allegations in Paragraph 229 are denied.

**COUNT VIII: [ALLEGED] PATENT INFRINGEMENT OF THE '145 PATENT**

230.    Defendants incorporate by reference and restate each and every response to the preceding paragraphs of the Complaint as though fully set forth herein.

231.    Defendants deny all allegations of Paragraph 231.

232.    Defendants deny all allegations of Paragraph 232.

233.    Defendants deny all allegations of Paragraph 233.

234.    Defendants deny all allegations of Paragraph 234.

235.    Defendants admit that Exhibit 22 to the Complaint is a claim chart that purports to analyze claim 1 of the '145 Patent. Defendants deny the allegations found within Exhibit 22 and

deny that they have committed or are committing acts of infringement in this District or elsewhere with respect to the Asserted Patents. The remaining allegations in Paragraph 235 are denied.

**COUNT IX: [ALLEGED] PATENT INFRINGEMENT OF THE '891 PATENT**

236.    Defendants incorporate by reference and restate each and every response to the preceding paragraphs of the Complaint as though fully set forth herein.

237.    Defendants deny all allegations of Paragraph 237.

238.    Defendants deny all allegations of Paragraph 238.

239.    Defendants deny all allegations of Paragraph 239.

240.    Defendants deny all allegations of Paragraph 240.

241.    Defendants admit that Exhibit 23 to the Complaint is a claim chart that purports to analyze claim 23 of the '891 Patent. Defendants deny the allegations found within Exhibit 23 and deny that they have committed or are committing acts of infringement in this District or elsewhere with respect to the Asserted Patents. The remaining allegations in Paragraph 241 are denied.

**COUNT X: [ALLEGED] PATENT INFRINGEMENT OF THE '701 PATENT**

242.    Defendants incorporate by reference and restate each and every response to the preceding paragraphs of the Complaint as though fully set forth herein.

243.    Defendants deny all allegations of Paragraph 243.

244.    Defendants deny all allegations of Paragraph 244.

245.    Defendants deny all allegations of Paragraph 245.

246.    Defendants deny all allegations of Paragraph 246.

247.    Defendants admit that Exhibit 24 to the Complaint is a claim chart that purports to analyze claim 1 of the '701 Patent. Defendants deny the allegations found within Exhibit 24 and deny that they have committed or are committing acts of infringement in this District or elsewhere with respect to the Asserted Patents. The remaining allegations in Paragraph 247 are denied.

### COUNT XI: [ALLEGED] PATENT INFRINGEMENT OF THE '744 PATENT

248.    Defendants incorporate by reference and restate each and every response to the preceding paragraphs of the Complaint as though fully set forth herein.

249.    Defendants deny all allegations of Paragraph 249.

250.    Defendants deny all allegations of Paragraph 250.

251.    Defendants deny all allegations of Paragraph 251.

252.    Defendants deny all allegations of Paragraph 252.

253.    Defendants admit that Exhibit 25 to the Complaint is a claim chart that purports to analyze claim 12 of the '744 Patent. Defendants deny the allegations found within Exhibit 25 and deny that they have committed or are committing acts of infringement in this District or elsewhere with respect to the Asserted Patents. The remaining allegations in Paragraph 253 are denied.

### COUNT XII: [ALLEGED] PATENT INFRINGEMENT OF THE '833 PATENT

254.    Defendants incorporate by reference and restate each and every response to the preceding paragraphs of the Complaint as though fully set forth herein.

255.    Defendants deny all allegations of Paragraph 255.

256.    Defendants deny all allegations of Paragraph 256.

257.    Defendants deny all allegations of Paragraph 257.

258.    Defendants admit that Exhibit 26 to the Complaint is a claim chart that purports to analyze claim 1 of the '833 Patent. Defendants deny the allegations found within Exhibit 26 and deny that they have committed or are committing acts of infringement in this District or elsewhere with respect to the Asserted Patents. The remaining allegations in Paragraph 258 are denied.

### COUNT XIII: [ALLEGED] PATENT INFRINGEMENT OF THE '960 PATENT

259.    Defendants incorporate by reference and restate each and every response to the preceding paragraphs of the Complaint as though fully set forth herein.

260.    Defendants deny all allegations of Paragraph 260.

261.    Defendants deny all allegations of Paragraph 261.

262.    Defendants deny all allegations of Paragraph 262.

263.    Defendants admit that Exhibit 27 to the Complaint is a claim chart that purports to analyze claim 1 of the '960 Patent. Defendants deny the allegations found within Exhibit 27 and deny that they have committed or are committing acts of infringement in this District or elsewhere with respect to the Asserted Patents. The remaining allegations in Paragraph 263 are denied.

## COUNT XIV: DECLARATORY JUDGMENT OF [ALLEGED] NO RAND OBLIGATION/VIOLATION

264.    Defendants incorporate by reference and restate each and every response to the preceding paragraphs of the Complaint as though fully set forth herein.

265.    Defendants state the terms of the Common Patent Policy speak for themselves and deny the allegations in Paragraph 265 to the extent inconsistent therewith. The remaining allegations in Paragraph 265 are denied.

266.    Defendants state that the H.264 Recommendation/Standard speaks for itself and deny the allegations in Paragraph 266 to the extent inconsistent therewith. The remaining allegations in Paragraph 266 are denied.

267.    Defendants state that the H.265 Recommendation/Standard speaks for itself and deny the allegations in Paragraph 267 to the extent inconsistent therewith. The remaining allegations in Paragraph 267 are denied.

268.    Paragraph 268 states conclusions of law to which no response is required. To the extent a response is required, Defendants state the terms of the Common Patent Policy, H.264 Standard, and H.265 Standard speak for themselves, and deny the allegations in Paragraph 268 to the extent inconsistent therewith. The remaining allegations in Paragraph 268 are denied.

269.    Paragraph 269 states conclusions of law to which no response is required, and they are denied to the extent a response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 269 and therefore deny them.

270.    Paragraph 270 states conclusions of law to which no response is required. To the extent a response is required, Defendants state the terms of the ITU Common Patent Policy speak for themselves, and deny the allegations in Paragraph 270 to the extent inconsistent therewith. The remaining allegations in Paragraph 270 are denied.

271.    Paragraph 271 states conclusions of law to which no response is required. To the extent a response is required, Defendants admit that a dispute exists between Nokia and Defendants concerning whether Nokia's declared-essential and actually-essential encoding patent claims are or are not subject to the ITU Common Patent Policy, that Policy's RAND commitment, or any other provisions of that Policy. Defendants deny that Nokia has negotiated with them in good faith. Defendants admit that they have not agreed and do not agree with Nokia's position that Nokia's declared-essential and actually-essential encoding patent claims are not subject to the ITU Common Patent Policy, that Policy's RAND commitment, or any other provisions of that Policy. The remaining allegations in Paragraph 271 are denied.

272.    Defendants admit that Nokia is seeking alternative declarations from this Court, but deny that Nokia is entitled to either of those declarations.

## ATTORNEYS' FEES

273.    Defendants deny all allegations of Paragraph 273.

## DEMAND FOR JURY TRIAL

274.    Paragraph 274 states a demand for a jury trial, which is not an allegation requiring a response. To the extent a response is required, Defendants deny the allegations in Paragraph 274.

## PRAYER FOR RELIEF

275.    Defendants deny that Plaintiff is entitled to any relief from Defendants, whether sought in the Prayer for Relief or otherwise. Plaintiff's Prayer for Relief should, therefore, be denied in its entirety and with prejudice, including its subsections A-J, and Plaintiff should take nothing from Defendants.

## <u>DEFENSES</u>

Defendants assert the following defenses to Plaintiff's claims, without admitting to the truth of any allegations in Plaintiff's claims and without assuming any legal or factual burden not otherwise assigned to them under law.

Defendants reserve all rights to allege additional defenses, including defenses under Rule 8(c) of the Federal Rules of Civil Procedure, the Patent Laws of the United States, and any other defenses at law or in equity that may exist now or that may be available in the future based on discovery and further factual investigation in this action.

### FIRST DEFENSE
### (Failure to State a Claim)

The Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE
### (Invalidity)

The claims of the Asserted Patents are invalid for failure to meet the requirements of one or more sections of Title 35, United States Code, including but not limited to §§ 101, 102, 103, 112, 115, 116, 132, 156, 251, 256, and/or 282 and/or non-statutory obviousness type double patenting.

**THIRD DEFENSE**
**(Non-infringement)**

Defendants have not infringed and do not infringe any valid and enforceable claim of the Asserted Patents, either directly or indirectly, either literally or under the doctrine of equivalents, and have not otherwise committed any acts in violation of 35 U.S.C. § 271.

**FOURTH DEFENSE**
**(Prosecution History Estoppel and Disclaimer)**

Plaintiff's claims are barred in whole or in part by prosecution history estoppel and disclaimer. Plaintiff is estopped, and has disclaimed claim scope, based on statements, representations, and admissions made during the prosecution before the United States Patent and Trademark Office of the patent families resulting in the Asserted Patents.

**FIFTH DEFENSE**
**(Ensnarement)**

Plaintiff's claims of patent infringement under the doctrine of equivalents, if any, are barred under the doctrine of ensnarement.

**SIXTH DEFENSE**
**(Equitable Defenses)**

Plaintiff's claims are barred, in whole or in part, by equitable doctrines, including the doctrines of waiver, implied waiver, estoppel, acquiescence, patent misuse, inequitable conduct, laches, and/or unclean hands.

**SEVENTH DEFENSE**
**(Limitations on Damages and Costs)**

Plaintiff's recovery for alleged infringement of the Asserted Patents, if any, is limited by Title 35 of the United States Code, including, without limitation, 35 U.S.C. §§ 284, 285, 286, 287, and 288.

**EIGHTH DEFENSE**
**(No Equitable Relief)**

Plaintiff is not entitled to equitable relief with respect to the Asserted Patents under any theory because Plaintiff has not and will not suffer irreparable harm; Plaintiff is not without an adequate remedy at law; the balance of the hardships do not favor entry of an injunction; and/or public policy concerns weigh against any equitable relief.

**NINTH DEFENSE**
**(No Exceptional Case and No Attorneys' Fees)**

Plaintiff is not entitled to recover attorneys' fees associated with this action under 35 U.S.C. § 285, or pursuant to the Court's inherent power.

**TENTH DEFENSE**
**(Lack of Standing)**

To the extent that Plaintiff lacks all substantive rights to bring suit and to exclude others from practicing the claims of any of the Asserted Patents, Plaintiff's claims are barred by a lack of standing.

**ELEVENTH DEFENSE**
**(Failure to Mark)**

Plaintiff's claims for damages prior to the filing of this lawsuit are barred to the extent Plaintiff, its predecessors-in-interest, or licensees failed to comply with the requirements of 35 U.S.C. § 287, including its marking requirement. In particular, Plaintiff fails to identify any facts or allegations that could establish that Plaintiff, its predecessors-in-interest, and/or its licensees complied with the marking requirements of 35 U.S.C. § 287 for any practicing products, and therefore Plaintiff is not entitled to seek damages any earlier than the date it can establish actual notice of the alleged infringement.

### TWELFTH DEFENSE
### (License and Exhaustion)

Plaintiff's claims of patent infringement are barred to the extent the alleged infringement is licensed, either expressly or impliedly, or otherwise authorized. Plaintiff's claims of patent infringement are also barred to the extent that Plaintiff has exhausted its rights and remedies as to the alleged infringement.

### THIRTEENTH DEFENSE
### (Extraterritoriality)

Plaintiff's claims for patent infringement are precluded in whole or in part to the extent that any of the accused functionalities, services, or acts are located or performed outside the United States.

### FOURTEENTH DEFENSE
### (FRAND/RAND Damages Limitation)

To the extent that any of the Asserted Patents are essential to any standard, Plaintiff's recovery for alleged infringement of the Asserted Patents, if any, is limited by obligations to license such patents on fair, reasonable, and nondiscriminatory ("FRAND" or "RAND") terms.

### FIFTEENTH DEFENSE
### (No Willful Infringement)

Plaintiff's claims for enhanced damages, if any, and an award of fees and costs against Defendants have no basis in fact or law and should be denied.

### SIXTEENTH DEFENSE
### (Section 1498)

Plaintiff's claims are barred by 28 U.S.C. § 1498 to the extent Plaintiff's infringement allegations concern alleged use of the Asserted Patents by or for the government of the United States, with the government's authorization and/or consent.

## COUNTERCLAIMS

Counterclaim Plaintiffs Warner Bros. Entertainment Inc., Warner Bros. Discovery, Inc., and WarnerMedia Direct, LLC (collectively, "Warner Bros." or "Counterclaim Plaintiffs"), bring the following counterclaims against Counterclaim Defendants Nokia Corporation, Nokia Technologies Oy, and Nokia of America Corporation (collectively, "Nokia" or "Counterclaim Defendants") for treble compensatory damages and injunctive relief under the antitrust laws of the United States and for compensatory and punitive damages and injunctive relief under state law. Warner Bros. also seeks related declaratory judgments against Nokia from this Court. For its counterclaims against Nokia, Warner Bros. alleges the following:

### NATURE OF THE ACTION

1.     Warner Bros., a global leader in streaming, brings this action to remedy Nokia's abusive patent-licensing practices and unlawful scheme to acquire, exploit, and maintain monopoly power over the technology to encode and decode content for video streaming. Warner Bros. also seeks to remedy Nokia's related violations of state law, including fraud and breach of contract. Finally, Warner Bros. seeks relevant related declaratory judgments from the Court to establish the parties' rights and obligations with respect to actual controversies between the parties.

2.     Nokia owns certain patents that cover technologies for video encoding and decoding—functions that are critical to streaming video. Nokia insists that some of its patents, including the Asserted Patents, cover technology mandated by industry standards that streaming services must comply with to be compatible with end-user devices.

3.     Nokia's scheme has been years in the making and has now come to fruition. Nokia laid the trap by repeatedly lying to standard-setting organizations ("SSOs") to get them to adopt standards that Nokia contends require a license to Nokia's patents. Having succeeded, Nokia then waited while implementers, including streaming providers like Warner Bros., used the standards

in their products and services. Nokia then reneged on its promises and embarked on a worldwide campaign demanding royalties from streaming providers, including Warner Bros., that bear no relation to the "reasonable and non-discriminatory" ("RAND") terms Nokia promised to offer. Nokia uses the threat of injunction and complete exclusion from key geographic markets to attempt to extort those who do not capitulate.

4.    Warner Bros. is a willing licensee of standard essential patents that it is actually using.

5.    Members of a SSO draft and promulgate industry standards and collectively select the technologies that implementers of the standard must practice to comply with the standards. Patents that cover an industry standard differ from other patents because they are infringed by implementing products and/or services that are compliant with the standard—these are "standard essential patents" or "SEPs."

6.    Before including patented or potentially patentable technology in an industry standard, SSOs require their participants to disclose any putative SEPs and commit to license them on RAND terms to any willing licensee. Among other purposes, this RAND requirement ensures that patent holders do not "hold up" implementers after standardization by refusing to license such patents at all, or by insisting on a non-RAND or supra-RAND royalty.

7.    "Hold up" strategies capitalize on the very nature of standardized industries: industry participants invest significant resources developing products and technologies that conform to the standard and find it prohibitively expensive to abandon their investments and switch to another technology after standardization. Because industry participants become "locked in" to the standard, SEP holders may be able to renege on their RAND commitments, threaten the

entirety of implementers' significant investments in standard-compliant products, and thereby extract supra-RAND royalties. In so doing, SEP holders risk running afoul of competition laws.

8.       SSOs present a serious risk of anticompetitive harm when members deliberately fail to disclose pertinent patent rights, withhold RAND commitments, or make RAND commitments and refuse to honor them.

9.       That is what is happening here. Nokia does not make or sell products that practice the H.264/AVC or H.265/HEVC video coding standards (together, the "Coding Standards"). Its revenue stems from licensing its patents to companies that make, sell, or offer for sale standard-compliant products and services.

10.      Nokia first lulled the Coding Standards SSOs into a false sense of security via a general commitment to grant RAND licenses to any of its technologies used in the SSOs' standards. Nokia then deliberately failed to disclose its relevant patents on video encoding and decoding until after those features were fully frozen into the first version of each respective standard. Nokia then belatedly and fraudulently promised to license its patents for video encoding and decoding on RAND terms so that the Coding Standards SSOs would continue to include Nokia's technologies in the Coding Standards and/or new releases of those standards. Nokia correspondingly manipulated the standard-setting process to exclude alternative technologies, and to ensure that the Coding Standards SSOs moved forward with the Coding Standards and new releases instead of abandoning them.

11.      After deceiving the Coding Standards SSO and its members and excluding rival technology from the Coding Standards and new releases, Nokia exploited its unlawfully acquired power against Warner Bros. and other implementers. Nokia has:

• Refused to honor its promises to license its video coding patents on RAND terms;

- Denied that it owes any obligation to license its video encoding patent claims on RAND terms;

- Demanded excessive and discriminatory royalties from companies, including Warner Bros., that provide video-streaming services and implement the Coding Standards;

- ████████████████████████████████████████████

- Sought double recovery from Warner Bros. for already-licensed activities; and

- Pursued exclusionary remedies designed to increase Warner Bros.' costs and coerce Warner Bros. to capitulate to Nokia's unreasonable, non-RAND demands.

12.    By its acts, practices, and conduct, Nokia has unlawfully monopolized each of the Relevant Technology Markets, as described in more detail below. Nokia commands monopoly power in the Relevant Technology Markets. Nokia systematically excluded competitors in the Relevant Technology Markets, acquired the power to demand supra-RAND licensing terms, and is in fact doing so. Nokia's actions have injured competition by, *inter alia*, excluding alternative technologies; imposing unjustified costs and terms on Warner Bros. and other companies that make, use, sell, or offer for sale goods or services practicing the Coding Standards; imposing unjustified higher costs on consumers; and hindering broader adoption of the Coding Standards. But for Nokia's wrongful conduct, Warner Bros. would have been able to obtain any necessary licenses to standard-essential technology on RAND terms.

13.    In addition to violating federal antitrust laws, Nokia's conduct in furtherance of its monopolization scheme also gives rise to state law causes of action, specifically those governing fraud and breach of contract. Nokia's false commitment to license its essential patents on RAND terms and declaration of specific patents to the SSOs that it never intended to license on RAND terms amounts to fraud. Furthermore, its deliberate non-disclosure of relevant patents amounts to a fraudulent omission and breach of its obligation to timely disclose its patents to the Coding

Standards SSOs. These actions were designed to mislead the SSO and its members into adopting and continuing to select alleged Nokia technology to the exclusion of alternatives. Furthermore, by reneging on its explicit promises to license its video coding patents on RAND terms, Nokia has breached its contractual obligations to the Coding Standards SSO and intended third-party beneficiaries, such as Warner Bros., who relied on those commitments when adopting the Coding Standards. Collectively, these fraudulent omissions and misrepresentations and contractual breaches enabled Nokia's unlawful monopolization scheme and have themselves directly harmed Warner Bros. and other implementers.

14.     Therefore, to remedy harms already inflicted and to prevent further harm to Warner Bros.' business and property, including its streaming services, and to redress further harm to competition more generally in the Relevant Technology Markets, Warner Bros. brings this action for treble damages, declaratory relief, and injunctive relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26. Warner Bros. also seeks from this Court all appropriate remedies associated with Nokia's fraud and breaches of contracts and covenants to which Warner Bros. is an intended third-party beneficiary. Warner Bros. also seeks declaratory judgment under 28 U.S.C. § 2201 to establish that (i) Nokia's binding RAND promises to the Coding Standards SSOs encumber all its declared-essential and actually-essential video coding patents, not just those that cover video-decoding technology; (ii) Nokia has not complied with its RAND promises; (iii) Nokia has waived its rights because it deliberately did not timely disclose its patent rights to the relevant SSOs; (iv) Nokia's claims against Warner Bros. are exhausted and subject to express or implied licenses; (v) Nokia is entitled to no relief for Warner Bros.' encoding performed outside of the United States; and (vi) each of the Asserted Patents is invalid and not infringed.

## PARTIES

15.    Counterclaim Plaintiff Warner Bros. Entertainment Inc. is a Delaware corporation with its principal place of business located at 4000 Warner Boulevard, Burbank, California, 91522.

16.    Counterclaim Plaintiff Warner Bros. Discovery, Inc. is a Delaware corporation with its principal place of business located at 230 Park Avenue South, New York, NY 10003.

17.    Counterclaim Plaintiff WarnerMedia Direct, LLC is a Delaware limited liability company with its principal place of business located at 30 Hudson Yards, New York, New York, 10001.

18.    Upon information and belief, Counterclaim Defendant Nokia Corporation is a foreign corporation organized under the laws of Finland, located at Karakaari 7, FIN-02610, Espoo, Finland.

19.    According to the allegations set forth in the Complaint, Counterclaim Defendant Nokia Technologies Oy is a foreign corporation organized under the laws of Finland, with its principal place of business at Karakaari 7, FIN-02610, Espoo, Finland. Nokia Technologies Oy is a wholly owned subsidiary of Nokia Corporation.

20.    Upon information and belief, Counterclaim Defendant Nokia of America Corporation is a Delaware corporation with its principal place of business located at 3201 Olympus Boulevard, Dallas, Texas 75019. Upon information and belief, Nokia of America Corporation is a wholly owned subsidiary of Nokia Corporation.

21.    Upon information and belief, Counterclaim Defendants (collectively "Nokia") act as a common, unified economic enterprise.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over Warner Bros.' federal counterclaims pursuant to 28 U.S.C. §§ 1331 (federal question), 1337 (commerce and antitrust regulation), and 2201 (declaratory judgment).

23.     This Court has subject matter jurisdiction over Warner Bros.' pendent state law counterclaims pursuant to 28 U.S.C. § 1367. Each of Warner Bros.' state law counterclaims arises out of the same factual nucleus as Warner Bros.' federal law claims.

24.     Moreover, this Court has subject matter jurisdiction over Warner Bros.' counterclaims pursuant to 28 U.S.C. § 1367 because these counterclaims are so related to the claims in this Action over which the Court has original jurisdiction such that they form part of the same case or controversy under Article III of the U.S. Constitution.

25.     Counterclaim Defendants are subject to this Court's personal jurisdiction pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rules of Civil Procedure 4(k)(1) and (2), and the Delaware Long Arm Statute, 10 Del. C. § 3104(c)(1). All Counterclaim Defendants have minimum contacts with this District or with the United States. Because of Counterclaim Defendants' contacts with this District and the United States, the exercise of personal jurisdiction over them would not offend traditional notions of fair play and substantial justice.

26.     Furthermore, this Court has specific personal jurisdiction over Nokia Technologies Oy because it has commenced the underlying patent infringement action in this Court.

27.     Furthermore, this Court has specific personal jurisdiction over Nokia Corporation based on its minimum contacts with this forum. For example, on information and belief, Nokia Corporation was integrally involved in the commencement of the underlying patent infringement action in this Court. Nokia Corporation maintains custody and control over the Asserted Patents and directs their licensing and enforcement, including through its wholly owned subsidiary, Nokia

Technologies Oy, an entity dedicated to managing and licensing Nokia's patent portfolio. Nokia Corporation and Nokia Technologies Oy have represented themselves as a single entity—"Nokia"—in negotiations with Warner Bros. ███████████ *after* this suit was filed. ████

███████████████████████████████████████████████████████

███████████████████████████████████████████████.

Furthermore, Nokia Corporation has recently availed itself of this forum for the purpose of litigating a (F)RAND dispute over the same portfolio and made no distinction between it and its licensing subsidiary in its allegations. *See* Complaint, *Nokia Corp. et al. v. Amazon.com, Inc.*, No. 1:23-cv-01232-GBW, D.I. 1 (D. Del.) ("Plaintiffs Nokia Corporation and Nokia Technologies Oy ("Nokia") file this Original Complaint . . . .").

28.    In addition, Nokia Corporation has availed itself of the benefits of this Court, having filed at least 13 actions in this District previously.[1]

29.    Furthermore, this Court has general personal jurisdiction over Nokia of America Corporation by virtue of its being incorporated in Delaware. In addition, Nokia of America Corporation has availed itself of the benefits of this Court, having filed at least one action in this District previously. *See* C.A. No. 25-1106 (D. Del.).

30.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as all Counterclaim Defendants are corporations subject to the Court's personal jurisdiction with respect to the civil action in question. Additionally, venue is proper under 15 U.S.C. § 22 because Counterclaim Defendants solicit and transact business in this District.

---

[1]    C.A. Nos. 05-16; 06-509; 09-791; 09-1002; 11-15; 11-259; 12-549; 12-550; 12-551; 12-552; 12-553; 12-554; 23-1232.

## I.    STANDARD-SETTING ORGANIZATIONS

31.    New video coding technologies typically are only widely commercialized after service providers and device manufacturers collectively agree on compatible technology specifications for related products or services. For virtually all video coding technologies, that process has consisted of inclusive, multi-participant standards development efforts conducted under the auspices of leading standard-setting organizations ("SSOs").

32.    Standards can play a critical role in the development of video coding technologies. Standards facilitate the adoption and advancement of technology as well as the development of products that can interoperate with one another. Companies that produce products compatible with a standard can design products by referencing only the standard documentation, without the need to communicate separately with every other company with which their products may need to operate. Companies producing products that implement a standard facilitate interoperability among different products, and consumers of those products can be confident that products from multiple vendors will work together as intended under the standard.

33.    Industry standards thus ensure the interoperability of products and facilitate the sharing of information among purchasers of products from competing suppliers, thereby enhancing the utility of all products and enlarging the overall consumer market. But in creating these standards, SSOs and their members ultimately choose which technologies will be available to consumers and which technologies will not.

34.    Some of the technologies included in these standards are covered by patents. If the standard specifies the use of a particular technology that is covered by patents, products that comply with the standard necessarily infringe those SEPs.

35.    Because a device or service that implements the standard has to practice integrated SEPs, the owners of SEPs—even the owner of just one SEP—can, unless restrained, demand and

obtain exorbitant royalties, far in excess of the value (if any) of the related technology independent of its inclusion in the standard. Implementers that are unwilling to pay such excessive royalties face the risk of exclusion from all of the standard, including the unpatented and public-domain portions. This threat of foreclosure, left unchecked, puts an implementer's whole investment at risk. And SEP holders may attempt to make good on this threat by seeking exclusionary remedies that eliminate implementers' market access entirely.

36.     The term patent "hold up" refers to the exploitation of SEPs to extract unreasonable or discriminatory royalties or other terms. Patent hold-up harms competition, impedes the dissemination of standardized technology, and stymies consumer benefits that flow from widespread adoption of the standard. The RAND (or FRAND) requirement serves to curb this potential for anticompetitive abuse and its effects. For example, if a patent holder refuses to commit to license on RAND terms, SSO rules typically require participants to select another technology for the standard or direct them not to standardize the related function at all.

37.     The anticompetitive effects of hold-up are magnified in the context of standards, such as the Coding Standards at issue here, which incorporate many different SEPs held by many different patent owners. The cumulative royalty burden that an implementer must pay to satisfy all SEP holders for a given standard is referred to as the "royalty stack." SEP holders are limited to the value of their SEPs as a portion of the royalty stack. And SEP holders cannot charge a premium based on the SSO writing their technology into the standard or from the value of the standard itself. Rather, the total royalty must be reasonable; the demands of any individual SEP owner must be assessed in light of the total number of SEPs included in the standard; and the royalty should reflect the "ex ante," pre-standardization value of the patent(s)—a point at which licensees could still turn to competing alternative technologies.

38.     Principles of patent-exhaustion law also qualify SEP holders' rights. SEP holders may not "double dip" and extract multiple royalties for use of the same patented invention from entities at different points of the same supply chain. Once the SEP holder licenses its technology to an entity, that entity's authorized use or sale of an item or service that embodies the SEP terminates all patent rights to that item.

39.     To reduce the probability that implementers of their standards will be subject to abusive practices by patent holders, SSOs have adopted rules, policies, and procedures that address the disclosure and licensing of patents that SSO participants may assert in relation to the practice of the standard under consideration.

## II.     THE CODING STANDARDS: H.264/AVC AND H.265/HEVC

40.     Nokia's improper conduct concerns, *inter alia*, Nokia's fraudulent omissions and representation to SSOs that promulgate video coding standards; Nokia's breach of its contractual obligation to those SSOs, their members and affiliates, and intended third-party beneficiaries, including Warner Bros.; and Nokia's unlawful scheme to acquire, exploit, and maintain monopoly power over the technology to encode and decode content for video streaming.

41.     Video coding or compression is the process of encoding a video file to reduce its size while maintaining an acceptable level of visual quality. An encoded video is represented as a bitstream—a sequence of bits—that can be transmitted to another device (e.g., a TV or smartphone) over the internet. The other device can then decode the encoded video bitstream to play the video. The video coding process enables video streaming platforms to efficiently transmit high-quality videos over the internet.

42.     For over twenty years, the International Telecommunication Union's Telecommunication Standardization Section ("ITU-T"), International Organization for Standardization ("ISO"), and International Electrotechnical Commission ("IEC") (collectively, the

"Coding Standards SSOs") promulgated the two standards at issue here: the H.264 or Advanced Video Coding ("AVC") Standard and the H.265 or High Efficiency Video Coding ("HEVC") Standard (collectively, the "Coding Standards").[2]

43.     The H.264/AVC Standard was developed by the Joint Video Team ("JVT") and jointly promulgated by the Coding Standards SSOs. The JVT is a collaborative group composed of (1) the Motion Picture Experts Group ("MPEG"), the video subgroup of the ISO/IEC and (2) the Video Coding Experts Group ("VCEG"), a subgroup of the ITU. The ITU's VCEG performed the early development of the standard, and the JVT was created in 2001 to finalize it. The first version of H.264 was adopted by the ITU-T in May 2003, as well as by the ISO/IEC as 14496-10.[3]

44.     The H.264 Standard states that it "designed to enable the use of [a] coded video representation in a flexible manner for a wide variety of network environments."[4] H.264 Standard also states that it "represents an evolution of the existing video coding standards" and "was developed in response to the growing need for higher compression of moving pictures for various applications such as videoconferencing, digital storage media, television broadcasting, Internet streaming, and communication."[5] It is the predominant, and therefore the most compatible, video-coding standard in current use for streaming services.

45.     On information and belief Nokia was a member of the ITU-T and participated in the development of the standard that became H.264.

---

[2] The ITU-T refers to these as "Recommendations" and the ISO/IEC refers to these as "International Standards."

[3] International Telecommunication Union, *Recommendation ITU-T H.264: Advanced video coding for generic audiovisual services* (Version 15, Aug. 2024) at i, available at https://www.itu.int/rec/T-REC-H.264-202408-I/en (hereinafter "H.264 (V15)").

[4] *Id.*

[5] *Id.*

46.     The H.265/HEVC Standard is a video compression standard intended to be the successor to the H.264 Standard. As with H.264 Standard, VCEG and MPEG formed a joint collaboration to develop the H.265 Standard in 2010, the Joint Collaborative Team on Video Coding ("JCTVC"). The H.265 Standard was first adopted by the ITU-T in April 2013, as well as by the ISO/IEC as 23008-2.[6]

47.     Like H.264, the H.265 Standard states that it was "designed to enable the use of [a] coded video representation in a flexible manner for a wide variety of network environments."[7] The H.265 Standard also states that it "represents an evolution of the existing video coding Recommendations" and "was developed in response to the growing need for higher compression of moving pictures for various applications such as Internet streaming, communication, videoconferencing, digital storage media and television broadcasting."[8] A variety of implementers use the H.265 Standard to encode and decode ultra-high-definition content.

48.     According to a publication co-authored by Miska Hannuksela, Nokia's Head of Video Research[9] and named inventor or co-inventor of three of the Asserted Patents, it has been reported that "HEVC provides a bit rate reduction of about 50% at the same subjective quality when compared to advanced video coding (H.264/AVC)."[10]

---

[6] International Telecommunication Union, *Recommendation ITU-T H.265: High efficiency video coding* (Version 10, July 2024) at i, available at https://www.itu.int/rec/T-REC-H.265-202407-I/en, (hereinafter "H.265 (V10)").

[7] *Id.*

[8] *Id.*

[9] Nokia, *Miska Hannuksela*, available at https://www.nokia.com/people/miska-hannuksela/ (last visited December 17, 2025).

[10] Sjoberg, R., Chen, Y., Hannuksela, M.M., et al., *Overview of HEVC High-Level Syntax and Reference Picture Management*, IEEE TRANSACTIONS ON CIRCUITS AND SYSTEMS FOR VIDEO TECHNOLOGY, Vol. 22, No. 12 (Dec. 2012), 1858, available at https://ieeexplore.ieee.org/stamp/stamp.jsp?tp=&arnumber=6324417.

49.     On information and belief, Nokia was a participant in the JCTVC's efforts to develop the H.265 Standard.

50.     The Coding Standards are the most popular methods of coding video content. Video streaming services, including those that Warner Bros. offers, must comply with the Coding Standards and associated releases to ensure compatibility between video viewing devices that are compliant with the Coding Standards and video content suppliers, e.g., streaming networks and services. Companies supplying products that implement a standard facilitate interoperability among different products, and consumers of those products can be confident that products from multiple vendors will work together as intended under the standard.

51.     In contrast, video-streaming services that implement non-standardized coding techniques generally will not work, or will work on a commercially unpredictable and impractical manner, with the large majority of end-user devices. Video-streaming platforms that do not comply with coding standards therefore have little, if any, market appeal to potential subscribers.

52.     Once the Coding Standards SSOs' members selected the technologies for the Coding Standards and their associated releases, which now are widely employed by industry participants like Warner Bros., alternative technologies that could have performed the same or similar functions (or alternative functions) were effectively excluded.

53.     The Coding Standards are not stagnant. Rather, they are subject to frequent technical updates and corrections as technology and the relevant industries evolve. For example, there have been 15 official "versions" or "editions" (i.e. new releases) of the H.264 Standard since

its release in 2003.[11] Similarly, there have been 10 total versions or editions of the H.265 Standard since its release in 2013.[12] Both were last updated in 2024.[13]

54.    Streaming platforms must continue to comply with the new "releases" or "versions" of the Coding Standards in order to maintain compatibility with end-user devices.

55.    Warner Bros. has invested millions of dollars in products and services that support the Coding Standards, and it would take substantial effort and time for Warner Bros. and the industry to develop software and hardware that use alternative techniques.

### III.    THE PATENT POLICY AND GUIDELINES

56.    The SSO patent policies and contracts at issue in this Action include the TSB[14] and ITU-T's Patent Policy and associated guidelines that were operative from 1999 to 2007 and the ITU-T, ITU-R, ISO, and IEC's Common Patent Policy and associated guidelines that have been operative since 2007 (collectively the "Patent Policy" and "Guidelines").[15] Across these successive versions, the provisions relevant to this Action have remained materially unchanged in substance.

57.    In addition to other limitations imposed by law, ITU, ISO, and/or IEC members must adhere to the Patent Policy. The Guidelines "clarify and facilitate the implementation of the Patent Policy."[16]

---

[11] H.264 (V15) at i-iii.

[12] H.265 (V10) at i.

[13] H.264 (V15) at ii-iii; H.265 (V10) at i.

[14] The TSB or "The Telecommunication Standardization Bureau" serves as permanent secretariat of the ITU-T. *See* International Telecommunication Union, *General Information on TSB*, available at https://www.itu.int/en/ITU-T/info/tsb/Pages/geninfo.aspx (last visited December 17, 2025).

[15] *See* International Telecommunication Union, *Record of revisions to the Patent Policy, the Forms and the Guidelines*, available at https://www.itu.int/en/ITU-T/ipr/Pages/revpatent.aspx (last visited December 17, 2025).

[16] *See* International Telecommunication Union, *Guidelines for Implementation of the Common Patent Policy for ITU-T/ITU-R/ISO/IEC* (2nd edition, April 23, 2012) ("2012 Guidelines"), available at https://www.itu.int/dms_pub/itu-t/oth/04/05/T04050000010007PDFE.pdf; International Telecommunication Union, *Guidelines for Implementation of the Common Patent*

58.    One key purpose of the Patent Policy is to encourage disclosure and identification of patents that may relate to standards under development. "In doing so, greater efficiency in standards development is possible and potential patent rights problems can be avoided."[17] Another key purpose of the Patent Policy is to act as a check on the anticompetitive risks of standard-setting and helps protect against members' abuse of the market power that SEPs may confer on their owners.

59.    The Patent Policy provides a "code of practice" to achieve an explicit objective of standards—"to ensure compatibility of technologies and systems on a worldwide basis."[18] The Patent Policy elaborates that to meet this objective, "which is in the common interests of all those participating," a patent that is "embodied fully or partly" in a standard must be "accessible to everybody without undue constraints."[19] "To meet this requirement in general is the sole objective of the code of practice."[20]

60.    The Patent Policy's code of practice is set forth in three enumerated paragraphs. Paragraph (1) provides that any party participating in the development of a standard "should, from the outset, draw the attention of the Director of ITU-TSB, the Director of ITU-BR, or the offices of the CEOs of ISO or IEC, respectively, to any known patent or to any known pending patent application, either their own or of other organizations."[21] Paragraph (2) provides that if a standard

---

*Policy for ITU-T/ITU-R/ISO/IEC* (3rd edition, June 26, 2015) ("2015 Guidelines"), available at https://www.itu.int/dms_pub/itu-t/oth/04/05/T04050000010009pdfe.pdf.

[17] *See* 2012 Guidelines at 1; 2015 Guidelines at 1.
[18] *See* 2012 Guidelines at Annex 1; 2015 Guidelines at Annex 1. The Patent Policy and Guidelines refer to standards as "Recommendations" and "Deliverables."
[19] *See* 2012 Guidelines at Annex 1; 2015 Guidelines at Annex 1.
[20] *See* 2012 Guidelines at Annex 1; 2015 Guidelines at Annex 1.
[21] *See* 2012 Guidelines at Annex 1; 2015 Guidelines at Annex 1.

is ultimately developed and "information as referred to in paragraph 1 has been disclosed, three different situations may arise:

> (2.1) The patent holder is willing to negotiate licences free of charge with other parties on a non-discriminatory basis on reasonable terms and conditions. . . .
>
> (2.2) The patent holder is willing to negotiate licences with other parties on a non-discriminatory basis on reasonable terms and conditions. . . .
>
> (2.3) The patent holder is not willing to comply with the provisions of either paragraph 2.1 or paragraph 2.2; in such case, the [standard] shall not include provisions depending on the patent.[22]

61.     Paragraph (3) demands that, regardless of whether case (2.1), (2.2), or (2.3) applies, the patent holder must provide a written statement to the ITU and/or ISO/IEC using a specific Patent Statement and Licensing Declaration form ("Declaration Form").[23] The Declaration Form gives the patent holder three options—options 1, 2, and 3 that respectively correspond to cases (2.1), (2.2), and (2.3) of the Patent Policy.[24]

62.     According to Section 3 of the Guidelines, "[a]s mandated by the Patent Policy in its paragraph 1, any party participating in the work of the Organizations should, from the outset, draw their attention to any known Patent or to any known pending Patent application, either its own or that of other organizations. In this context, the words "from the outset" imply that such information should be disclosed as early as possible during the development of the [standard]."[25] Section 5 of the Guidelines further states that "[e]arly disclosure of Patents contributes to the efficiency of the process by which [standards] are established. Therefore, each Technical Body, in

---

[22] *See* 2012 Guidelines at Annex 1; 2015 Guidelines at Annex 1.
[23] *See* 2012 Guidelines at Annex 1; 2015 Guidelines at Annex 1.
[24] *See* 2012 Guidelines at Annex 2; 2015 Guidelines at Annex 2.
[25] *See* 2012 Guidelines at 2; 2015 Guidelines at 2.

the course of the development of a proposed [standard], will request the disclosure of any known Patents essential to the proposed [standard]."[26]

63.    Parties that did not participate in the development of the standard may also submit Declaration Forms, and the Patent Policy and Guidelines apply to any patent or patent application disclosed after the approval of a standard.

64.    When a patent holder specifies a particular standard on a Declaration Form and submits it, the patent holder thereby commits to license any patents or patent applications that would be required to implement a specific ITU/ISO/IEC recommendation or deliverable, even if the Declaration Form does not specifically identify those patents or patent applications. Specifically, the "Declaration Form gives patent holders the means of making a licensing declaration relative to rights in Patents required for implementation of a specific [standard]," and "by submitting th[e] Declaration Form the submitting party declares its willingness to license (by selecting option 1 or 2 on the Form) . . . Patents held by it and whose license would be required to practice or implement part(s) or all of a specific [standard]."[27] The definition of "Patent" includes both patents and patent applications that would be essential to implement a specific standard.[28]

65.    According to the Guidelines, the "licensing declaration contained in the Declaration Form remains in force unless it is superseded by another Declaration Form containing more favourable licensing terms and conditions from a licensee's perspective[.]"[29]

66.    The Guidelines also provide for the optional submission of a General Patent Statement and Licensing Declaration Form that may be submitted to the ITU.[30] The Guidelines

---

[26] *See* 2012 Guidelines at 4; 2015 Guidelines at 4.
[27] *See* 2012 Guidelines at 3; 2015 Guidelines at 3.
[28] *See* 2012 Guidelines at 2; 2015 Guidelines at 2.
[29] *See* 2012 Guidelines at 4; 2015 Guidelines at 4.
[30] *See* 2012 Guidelines at 6, Annex 3; 2015 Guidelines at 6, Annex 3.

make clear that this general statement is not a substitute for making individual recommendation-specific disclosures, and those required individual disclosures serve independent purposes in protecting against anticompetitive abuse of the standard-setting process:

> Anyone may submit a General Patent Statement and Licensing Declaration Form . . . . The purpose of this form is to give Patent Holders the voluntary option of making a general licensing declaration relative to material protected by Patents contained in any of their Contributions. Specifically, by submitting this form, the Patent Holder declares its willingness to license its Patents owned by it in case part(s) or all of any proposals contained in its Contributions submitted to the Organization are included in Recommendation(s) and the included part(s) contain items for which Patents have been filed and whose licence would be required to practice or implement Recommendation(s).

> The General Patent Statement and Licensing Declaration Form is not a replacement for the "individual" (see clause 4 of Part I) Declaration Form, which is made per Recommendation, but is expected to improve responsiveness and early disclosure of the Patent Holder's compliance with the Patent Policy.[31]

67.     Regarding the assignment or transfer of patent rights, "if the Patent Holder specifically identified patents to ITU/ISO/IEC, then the Patent Holder shall have the assignee or transferee agree to be bound by the same licensing commitment as the Patent Holder for the same patent."[32]

68.     A patent holder who submits a Declaration Form makes a contractual commitment for the benefit of potential willing licensees, who are third-party beneficiaries to that commitment.

---

[31] *See* 2012 Guidelines at 6; 2015 Guidelines at 6.

[32] 2012 Guidelines at 5; *see also* 2015 Guidelines at 7 ("The rules governing the assignment or transfer of Patent rights are contained in the patent statement and licensing declaration forms (see Annexes 2 and 3)"); *id.* at Annex 2 ("Licensing declarations made pursuant to Clause 2.1 or 2.2 of the Common Patent Policy for ITU-T/ITU-R/ISO/IEC shall be interpreted as encumbrances that bind all successors-in-interest as to the transferred Patents. Recognizing that this interpretation may not apply in all jurisdictions, any Patent Holder who has submitted a licensing declaration according to the Common Patent Policy -be it selected as option 1 or 2 on the Patent Declaration form -who transfers ownership of a Patent that is subject to such licensing declaration shall include appropriate provisions in the relevant transfer documents to ensure that, as to such transferred Patent, the licensing declaration is binding on the transferee and that the transferee will similarly include appropriate provisions in the event of future transfers with the goal of binding all successors-in-interest.").

This patent holder thus becomes contractually bound to the Coding Standards SSOs for the benefit of third-party implementers to offer to license on RAND terms both patents identified in the Declaration Form and any patents or patent applications it owns that are required to implement the standard identified in the Declaration Form.

## IV.    ENCODING AND DECODING ARE BOTH ESSENTIAL TO THE CODING STANDARDS

69.    Nokia has taken the position that "[u]nder the ITU's Common Patent Policy, only _de_coding patent claims 'essential' to the H.264 and/or H.265 Recommendations are encumbered by a RAND commitment." Complaint ¶ 268 (emphasis in original). Nokia therefore contends that "patent claims covering encoding processes are not 'essential' to the H.264 and/or H.265 Standards and are thus not RAND encumbered." *Id.* ¶ 269.

70.    Nokia has cited several cherry-picked sentences from the Guidelines and the Coding Standards in support of its position.

71.    Without conceding that any of the asserted encoding claims in this case are essential, Warner Bros. disagrees that encoding claims are never essential to the Coding Standards.

72.    Nokia's position contradicts, *inter alia*: (1) the actual language of the Coding Standards (including their titles and stated purpose); (2) documents published by the ITU-T to support implementation of the Coding Standards; (3) Federal Circuit precedent; (4) long-standing industry consensus; (5) Nokia's infringement contentions in worldwide litigation against Warner Bros.; (6) Nokia's declarations to the Coding Standards SSOs that it believed encoding patent claims were essential; (7) Nokia's private statements that ██████████████████████ ███████████████████████████████████████████████ and (8) Nokia's public statements about (F)RAND licensing.

### A.  Language and Stated Purpose of the Coding Standards

73.    The Coding Standards are titled respectively "Advanced video coding for generic audiovisual services" and "High efficiency video coding."[33] The very titles of the Coding Standards make clear that they encompass both aspects of video coding—namely *en*coding and *de*coding.

74.    Both Coding Standards state that they represent "an evolution of the existing video coding Recommendations" developed "in response to the growing need for higher compression of moving pictures for various applications."[34] Thus, the express stated purpose of the Coding Standards is to address the need to improve compression technology, i.e., encoding technology.[35]

75.    To achieve this end, the Coding Standards each specify the structure and syntax that standard-compliant encoders must follow when structuring a standard-compliant bitstream. The Coding Standards also each specify a decoding process that standard-compliant decoders must follow when interpreting a standard-compliant bitstream.

76.    In order for an H.264/AVC or H.265/HEVC decoder to successfully interpret an encoded bitstream, the Standards thus mandate that the encoder "produce[] a bitstream conforming to" the respective AVC or HEVC Recommendation. Any encoding methods that are required to produce "a bitstream conforming" to a specific recommendation are essential to practice the Standard.

77.    Moreover, to the extent that Nokia may argue that an encoder need not produce a bitstream including every possible syntax and semantic elements permitted by the standard, such

---

[33] H.264 (V15) at i; H.265 (V10) at i.

[34] H.264 (V15) at i; H.265 (V10) at i.

[35] Nokia has conceded that compression and encoding are synonymous. Complaint ¶ 2 ("As opposed to decoding, encoding video generally refers to compressing or reducing the size of raw video files . . . .").

an encoder would do so at least optionally, and only by producing a bitstream conforming to the respective standard.

**B. ITU Conformance Specifications**

78.    The ITU has published supporting documents to assist implementors of the Coding Standards. These documents make clear that the Coding Standards specify features that both encoders and decoders are <u>required</u> to implement the respective Coding Standards.[36] These documents thus make clear that both encoding and decoding technologies are essential to the Coding Standards.

79.    For example, the ITU-T published a "Conformance specification for ITU-T H.264 advanced video coding" which "specifies tests designed to verify whether bitstreams and decoders meet the normative <u>requirements</u> specified" in H.264.[37] This conformance specification states that "an encoder can claim conformance to [H.264] if the bitstreams that it generates are conforming bitstreams" and it specifies "methods for (non-exhaustive) testing of whether encoders and decoders meet these <u>requirements</u>."[38]

80.    Similarly, the ITU-T published a "Conformance specification for ITU-T H.265 high efficiency video coding" which "specifies a set of tests and procedures designed to indicate whether encoders or decoders meet the normative <u>requirements</u> specified in" H.265.[39]

**C. Federal Circuit Precedent**

---

[36] Nokia has stated "The ITU's Common Patent Policy thus deems 'essential' only patent claims that are required to implement a specific Recommendation." Complaint ¶ 35.

[37] International Telecommunication Union, *H.264.1: Conformance specification for ITU-T H.264 advanced video coding* (Version 6, Feb. 2016) at i (emphasis added), available at https://www.itu.int/rec/T-REC-H.264.1-201602-I/en.

[38] *Id.* (emphasis added).

[39] International Telecommunication Union, *Conformance specification for ITU-T H.265 high efficiency video coding* (Version 3, Oct. 2018) at 1 (emphasis added), available at https://www.itu.int/rec/T-REC-H.265.1-201810-I/en.

81.     In *Qualcomm Inc. v. Broadcom Corp.,* the Federal Circuit made clear that encoding patent claims are not per se excluded from being essential to the Coding Standards, as Nokia now contends. 548 F.3d 1004 (Fed. Cir. 2008). Specifically, the Federal Circuit affirmed a District Court's determination that encoding claims asserted by Qualcomm against Broadcom "reasonably might be necessary" to H.264, meaning a "reasonable competitor would not expect to practice the H.264 standard without a license under the undisclosed claims." *Id.* at 1018-1019; *see also id.* at 1008-9 ("The asserted patents relate to video compression technology . . . Qualcomm filed the present lawsuit . . . claiming that Broadcom infringed the '104 and '767 Patents by making products compliant with the H.264 video compression standard.").

### D.  Long-Standing Industry Consensus

82.     Nokia's position contradicts the long-standing industry consensus that encoding can be standard essential. For example, as described in greater detail below, the MPEG/Via LA AVC/H.264 Patent Pool is a decades-old patent pool with wide industry participation that "provides access to essential patent rights for the AVC/H.264 (MPEG-4 Part 10) digital video coding standard."[40] Independent patent experts vet submitted patents to determine whether each is essential to practicing the standard before the patent can be admitted to the pool. This patent pool includes encoding patent claims, offers licenses for encoding, and even includes a specific license tier for video subscription services.[41] Thus, Nokia's position that encoding cannot be essential to the Coding Standards directly contradicts the industry's well-settled consensus.

### E.  Nokia's Infringement Contentions

---

[40] Via Licensing Alliance, *AVC/H.264 Overview*, available at https://via-la.com/licensing-programs/avc-h-264/#overview (last visited December 22, 2025).

[41] *See* Via Licensing Alliance, *AVC/H.264 License Fees*, available at https://via-la.com/licensing-programs/avc-h-264/#license-fees (last visited December 22, 2025).

83.     Nokia's infringement contentions make clear that Nokia is only accusing features that it alleges are required to encode video in a manner that complies with the Coding Standards. For example, Nokia's Complaint attached infringement contention charts for each Asserted Patent that purport to analyze bitstreams downloaded from Warner Bros. platforms. In each instance Nokia purports to show infringement because "the downloaded bitstream is in an H.264-compliant format" or because "the downloaded bitstream is in an H.265-compliant format." *See* Complaint, Exs. 14-27. Nokia's infringement allegations thus rest entirely on implementing the Coding Standards, such that, according to Nokia's infringement allegations, implementing the Coding Standards requires use of at least the Asserted Patents. Without conceding that the Asserted Patents are essential or required to implement the Coding Standards, and without conceding that any of Warner Bros.' products or services practice any claims of such patents, Nokia's contentions constitute an admission that it believes its asserted encoding patent claims are essential or required to implement the Coding Standards and therefore RAND-encumbered.

### F.  Nokia's Declarations to the Coding Standard SSOs

84.     Furthermore, Nokia declared encoding-only patents as essential to the Coding Standards SSOs, including those it is now asserting against Warner Bros. Nokia affirmed via its declarations that it "believed" its encoding-only patents were "Patents, the use of which would be required to implement" the Coding Standards. Nokia's position now—that encoding claims can never be required to implement the Coding Standards—is inconsistent with its own declarations to the Coding Standard SSO.

85.     For example, as further detailed below, Nokia declared Asserted U.S. Patent No. 8,175,148 (the "'148 Patent") as essential to both Coding Standards, even though its claims are solely directed to encoding. Independent claim 1 is directed to "[a] method of encoding a digital video sequence for use in a video coding application . . ."; independent claim 12 is directed to "[a]

video encoder for encoding a digital video sequence . . ."; and independent claim 23 is directed to "[a] video encoder for encoding a digital video sequence . . . ." Complaint, Ex. 3 at cols. 25-28.

86.    Similarly, and as further detailed below, Nokia declared Asserted U.S. Patent No. 6,856,701 (the "'701 Patent") as essential to both Coding Standards, even though its claims are solely directed to encoding. *See* Complaint, Ex. 10 at cols. 27-32.

87.    On information and belief, Nokia has declared many other encoding-only patents as essential to the Coding Standards. Nokia has also declared many other patents that include encoding claims as essential to the Coding Standards.

### G. Nokia's Statements During Negotiations

88.    Furthermore, during the parties' pre-litigation negotiations, Nokia personnel stated that ██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

### H. Nokia's Public Comments

89.    Furthermore, Nokia has publicly stated that a "'Standard Essential Patent' (SEP) is a patent covering technology that must be used by a product or service to comply with a mandatory or optional part of a given industry standard."[42] Encoding processes are thus essential to the extent they must be used by an encoder seeking to comply with mandatory or optional bitstream requirements defined in each respective Coding Standard.

### V.    NOKIA'S ANTICOMPETITIVE MISCONDUCT DURING STANDARDIZATION OF THE CODING STANDARDS

---

[42] Ex. A [Nokia, SEP Licensing Q&A (2023)] at 4.

90.    At all times relevant to these allegations Nokia was a member of the ITU and actively participated in the development of the Coding Standards. Because of this membership and participation in the H.264 and H.265 standard-setting process, Nokia was and is bound by the Patent Policy and Guidelines. As the assignee of Nokia Corporation's coding patents, Nokia Technologies Oy is bound by the commitments Nokia Corporation made to the Coding Standards SSOs.

91.    Nokia's misconduct and deception with respect to the H.264 and H.265 standard-setting processes has been threefold. First, Nokia submitted a false General Patent Statement and Licensing Declaration to the ITU wherein it committed to grant RAND licenses to its essential patents without any intention to honor that commitment. Second, Nokia advocated that technology purportedly covered by its intellectual property be incorporated in the Coding Standards, while deliberately failing to disclose that it held relevant patents or patent applications. Third, Nokia made intentionally false RAND declarations and failed to disclose that it had no intention of offering licenses to its declared patents on RAND terms.

92.    All the above misconduct violated Nokia's obligations to the Coding Standards SSOs and were part of a scheme to induce the Coding Standards SSOs to standardize technology that Nokia would later assert against implementers of the Coding Standards and refuse to license on RAND terms.

93.    The Coding Standards effectively dictate which coding technology must be used and the competing technology that will be discarded. Consequently, Nokia had compelling incentives to ensure that the Coding Standards mandated the use of its patented technologies. Widespread adoption of the standards would translate into more licensing opportunities for Nokia, as well as first-mover advantages in commercializing the technology. By contrast, if the Coding

Standards SSOs omitted Nokia's technologies from the Coding Standards, there would likely be little market for licenses to those stranded technologies.

## A. Nokia's False General Patent Statement and Licensing Declaration

94.    On behalf of Nokia Corporation, Harri Honkasalo, then Director of IPR for Standard Technology, signed a General Patent Statement and Licensing Declaration on June 7, 2001, in Espoo, Finland.[43] This Statement and Declaration was submitted to the ITU and provides as follows:

> In case part(s) or all of any proposals contained contributions submitted by [Nokia Corporation] are included in ITU-T Recommendation(s) and the included part(s) contain items that have been patented or for which patent applications have been filed and those whose use would be required to implement the ITU Recommendation(s), [Nokia Corporation] hereby declares, in accordance with the Statement on ITU-T Patent Policy. . . that . . . [t]he Patent Holder is prepared to grant on the basis of reciprocity for the relevant ITU-T Recommendation(s)—a license to an unrestricted number of applicants on a worldwide, nondiscriminatory basis and on reasonable terms and conditions.

95.    On information and belief, and as made clear by Nokia's subsequent conduct, Nokia never intended to honor its General Patent Statement and Licensing Declaration. Rather it falsely submitted that declaration to induce the ITU to incorporate technology it believed was covered by its patents into ITU standards, including the Coding Standards. And indeed, the ITU and associated SSOs relied on Nokia's General Patent Statement and Licensing Declaration when they decided to include (and/or continue to include in updated versions) any purported Nokia-owned technology in the Coding Standards.

## B. Nokia's Deliberate Non-Disclosure of Relevant Patents

96.    Furthermore, despite its involvement in developing both the Coding Standards, and despite being bound by the Patent Policy, Nokia repeatedly failed to disclose during development

---

[43] Ex. B.

of the Coding Standards that it had patent rights that Nokia has since asserted against implementers simply practicing those Standards.

97.     For example, Nokia did not notify the Coding Standards SSOs about any of the Asserted Patents until after the first iteration of the H.264 Standard was frozen and then published in May 2003, or until after the first iteration of the H.265 Standard was frozen and then published in April 2013.

98.     Specifically, and as further detailed below, Nokia deliberately delayed declaring the following Asserted Patents (or their applications) as essential to the H.264 Standard until after the purportedly claimed features had already been incorporated into the first version of the standard in May 2003:

| Asserted Patent | Date of Declaration | Nokia Entity Declaring | Signatory | Location | Exhibit |
|---|---|---|---|---|---|
| 8,175,148 (as Appl. 11/881367) | April 4, 2011 | Nokia Corporation | Kalle Moilanen, IPR Manager | Salo, Finland | Ex. C |
| 6,856,701 | October 11, 2010 | Nokia Corporation | Kalle Moilanen, IPR Manager | Salo, Finland | Ex. D |
| 8,107,744 (as Appl. 10/703109) | March 25, 2009 | Nokia Corporation | Kalle Moilanen, IPR Manager | Salo, Finland | Ex. E |
| 7,289,674 | December 21, 2007 | Nokia Corporation | Stephan Wenger, Sr. IPR Manager | Palo Alto, California | Ex. F |
| 9,800,891 (as Appl. Pub. 2001/0017944) | December 21, 2007 | Nokia Corporation | Stephan Wenger, Sr. IPR Manager | Palo Alto, California | Ex. G |
| 6,950,469 | June 26, 2007 | Nokia Corporation | Stephan Wenger, Sr. IPR Manager | Palo Alto, California | Ex. H |
| 7,532,808 (as Appl. Pub. 2003/0202594) | March 19, 2007 | Nokia Corporation | Jari Vaario, Director of IPR | Espoo, Finland | Ex. I |
| 6,968,005 | March 19, 2007 | Nokia Corporation | Jari Vaario, Director of IPR | Espoo, Finland | Ex. J |

| 8,050,321 (as Appl. Pub. 2006/0120451) | April 10, 2007 | Nokia Corporation | Stephan Wenger, Senior IPR Manager | Palo Alto, California | Ex. K |
|---|---|---|---|---|---|

99.     Nokia also deliberately delayed declaring the following Asserted Patents (or their applications) as essential to the H.265 Standard after the purportedly claimed features had already been made incorporated into the first version of the standard in April 2013:

| Asserted Patents | Date of Declaration | Nokia Entity Declaring | Signatory | Location | Exhibit |
|---|---|---|---|---|---|
| 6,856,701 | December 1, 2021 | Nokia Technologies Oy | Teemu Itälä & Jeremie Vaquer, authorized signatories | Espoo, Finland | Ex. L |
| 7,532,808; 6,711,211; 8,175,148; 7,289,674; 9,800,891 (as Appl. 09/766035) | December 15, 2014 | Nokia Corporation | Kalle Moilanen, Manager of Patenting | Salo, Finland | Ex. M |
| 8,050,321; 6,968,005; 8,005,145; 8,107,744; 9,571,833 (as Appl. 13/666,680) | June 11, 2013 | Nokia Corporation | Kalle Moilanen, IPR Manager, | Salo, Finland | Ex. N |

100.    Nokia deliberately never disclosed or declared U.S. Patent Nos. 6,711,211 or 8,005,145 to the H.264 Standard, despite now accusing H.264-compliant encoders of infringing those undeclared patents.

101.    Similarly, Nokia deliberately never disclosed or declared U.S. Patent No. 10,523,960 to the H.265 Standard, despite now accusing H.265-compliant encoders of infringing that undeclared patent.

102.    To the extent Nokia contends any accused features were only frozen into H.264 or H.265 after Nokia declared or otherwise disclosed its patent, such disclosures were fraudulently

made to induce the Coding Standards SSO to incorporate Nokia's purported technology, as describe below.

103.    Upon information and belief, Nokia withheld its patents to induce the Coding Standards SSOs to incorporate technology it believed was covered by its patents into the Coding Standards—but without providing those members with the ability to consider those alleged patent rights before the Coding Standards were frozen. If Nokia had satisfied its contractual obligations and timely disclosed its patent rights, the Coding Standards SSOs may have adopted alternative technologies or declined to include the relevant functionality in the final standard. By failing to disclose its patent rights before the Coding Standards were frozen, Nokia deprived members of the Coding Standards SSOs of the ability to consider those options and has harmed Warner Bros. and others who have since implemented the Coding Standards.

104.    Members of the Coding Standards SSOs and other third-party beneficiaries of Nokia's obligations under the Patent Policy reasonably expected Nokia to disclose its known patents and patent applications at the outset of the standardization process, not after functionality allegedly covered by a patent or patent application was approved for incorporation into the Coding Standards and/or after the Coding Standards were frozen. If Nokia held or had applied for patents potentially essential to the Coding Standards, then under the binding contractual rules of the Patent Policy, Nokia was obligated to disclose those patents from the outset, and at least before the Coding Standards were frozen.

105.    Nokia did not submit a Patent Statement and Licensing Declaration to the Coding Standards SSOs specifically identifying any of the Asserted Patents (or the applications for those patents) as allegedly essential to any specific aspect of the Coding Standards before the standards

were frozen, even though Nokia knew it possessed those patent rights during development of the
Coding Standards, as further detailed below.

106.    Indeed, Nokia did not disclose the existence of the Asserted Patents (and/or
applications for those patents) during the H.264 and H.265 standard-setting process, even while
Nokia personnel (including named inventors of the Asserted Patents) participated in the relevant
working groups that adopted the same technology that Nokia now claims is covered by the
Asserted Patents, and even though participants at meetings were repeatedly reminded of the Patent
Policy and their contractual obligation to disclose potentially essential patent rights.

107.    Under the Patent Policy, Nokia had binding contractual commitments with the
Coding Standards SSOs, for the benefit of the SSOs, their members, and any entity involved in
making, using, selling, offering for sale, and/or importing products that support the Coding
Standards, including Warner Bros. Upon information and belief, all these entities reasonably relied
on the Coding Standards SSOs' rules, including the Patent Policy, in supplying products that
support the Coding Standards.

108.    Warner Bros. has invested significant time and resources in connection with
supplying products and services in reliance on the transparency of the Coding Standards SSOs'
standard-setting process and the requirement that participants comply with the Coding Standards
SSOs' rules, including the Patent Policy requirement that members timely disclose during
development of the Coding Standards any patent rights that might be essential.

109.    Nokia's standard-setting misconduct is not an isolated incident, as Nokia has a
history of failing to timely disclose its allegedly essential patent rights to standard setting
organizations. As just one example, the Federal Circuit determined in *Core Wireless Licensing
S.A.R.L. v. Apple Inc.* that Nokia had a duty to disclose its allegedly essential patent rights before

the relevant standard was frozen and breached that contractual obligation by waiting years after the standard was frozen to first do so. 899 F.3d 1356, 1368 (Fed. Cir. 2018).

### C. Nokia's Fraudulent RAND Promises to the Coding Standards SSOs

110.    When Nokia finally did disclose that it had relevant patents or applications to the Coding Standards SSOs, it continued its deceitful scheme by making intentionally false RAND commitments for specific patents.

111.    For patents purportedly covering aspects of the Coding Standards that had not yet been finalized at the time of declaration, Nokia intended this deception to ensure that the Coding Standards SSOs—which were relying on Nokia to make truthful representations—would incorporate technologies in the standard that Nokia claims are covered by its patents and eliminate alternatives in the Technology Markets. For patents purportedly covering aspects of the Coding Standards that already had been published, Nokia's false RAND commitments were intended to ensure that Coding Standards SSOs did not revise or withdraw the standards incorporating technology purportedly covered by Nokia's IPR, as they would have been required to do. Nokia's false RAND commitments positioned Nokia to take advantage of its ill-gotten monopoly power to demand exorbitant royalties and unreasonable terms for its declared H.264 and H.265 SEPs—like it has done in the course of its dealings with Warner Bros. over the patents it now asserts in this litigation.

112.    Specifically, between 2002 and 2021, Nokia submitted numerous declarations to the Coding Standards SSOs promising to license its alleged SEPs to implementers of the Coding Standards on RAND terms. These declarations specifically reference and/or incorporate the Patent Policy. Accordingly, the Coding Standards SSOs relied on these declarations when they decided to include (and/or continue to include) any alleged Nokia coding technology in the Coding Standards. In those submissions, Nokia acknowledged it "believe[ed] that it holds granted and/or

pending applications for Patents, the use of which would be required to implement" the Coding Standards and declared that it was "prepared to grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to make, use and sell implementations of the" Coding Standards.

113.    Crucially, although now claiming that encoding patent claims are never essential or required to implement the Coding Standards, Nokia declared as essential patents with claims directed only to encoding technologies, as well as patents with claims directed to both encoding and decoding. Specifically, as discussed above and further detailed below, Nokia declared the asserted '148 and '701 Patents as essential to both Coding Standards despite the fact those patents include claims only directed to encoding. On information and belief, Nokia further declared numerous non-asserted, encoding-only patents as essential to both Coding Standards. Additionally, with the exception of the '960 Patent, Nokia declared the remaining Asserted Patents, which each include both encoding and decoding claims, as essential to one or both of the Coding Standards.

114.    A chart documenting the false RAND declarations with respect to the Asserted Patents is found in the preceding section. Further details about each Nokia declarations of the Asserted Patents are provided below.

115.    Without conceding that any Nokia patents are indeed essential or required to implement the Coding Standards, and without conceding that any of Warner Bros.' products or services practice any claims of such patents, Nokia is contractually obligated to offer to license on RAND terms at least the patents it identified to the Coding Standards SSOs—including but not limited to the patents mentioned explicitly above and their international counterparts. Nokia is also bound to offer licenses on RAND terms for any patents controlled by it that are indeed essential or required to implement the Coding Standards.

116.    Nokia has previously taken the position in this District that a party's declaration of a patent to an SSO amounts to a guarantee that the patent owner will license those patents on (F)RAND terms and conditions and requires no analysis regarding actual essentiality of the declared patents. For example, in successfully persuading a court in this District to remand a (F)RAND breach of contract case against Qualcomm to the Delaware Court of Chancery, Nokia affirmatively argued that its "breach of contract claim with respect to Qualcomm's declared-essential patents do not require any determination of whether any particular patent is in fact essential." Ex. O [Nokia's Brief in Support of Motion for Remand, *Nokia Corporation v. Qualcomm Incorporated*, C.A. 1:06-cv-00509, at 8, 1 (D. Del. Aug. 18, 2006)]; *see also Nokia Corp. v. Qualcomm, Inc.*, No. CIV A 06-509-JJF, 2006 WL 2521328, at *2 (D. Del. Aug. 29, 2006) (remanding and holding that an essentiality "determination is not necessary to the interpretation of the parties' contractual obligations for declared-essential patents").

**D.  Nokia's Misconduct with Respect to Each Asserted Patent**

117.    While Nokia's misconduct before the SSOs developing the Coding Standards is not limited to the Asserted Patents, they are representative of its broader pattern of deceitful and fraudulent conduct involving deliberate non-disclosure of relevant intellectual property rights and/or false RAND commitments.

118.    As shown below, Nokia personnel located in America were inventors of the Asserted Patents and/or implicated in standard-setting misconduct. On information and belief, at least some of these employees were directly employed by Nokia of America Corporation.

### *i.  7,532,808*

119.    U.S. Patent No. 7,532,808 (the "'808 Patent") is titled "Method for Coding Motion in a Video Sequence," and names Jani Lainema as the inventor, whose location was identified as Irving, Texas.

120.    The '808 Patent names Nokia Corporation as the original assignee. Upon information and belief, Nokia Technologies Oy is the '808 Patent's current assignee.

121.    The '808 Patent was issued on May 12, 2009, from an application filed on March 14, 2003, and purports to claim priority to March 15, 2002. The '808 Patent was granted following U.S. Patent Application Publication 2003/0202594.

122.    On March 19, 2007, after the first version of the H.264 Standard was published, Jari Vaario signed a "Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation | ISO/IEC Deliverable" on behalf of Nokia Corporation, in Espoo, Finland. Ex. I [Declaration H264-77]. Nokia submitted this Declaration Form to the ITU, ISO, and/or IEC. In this Declaration Form, Nokia declared that it believed U.S. Patent Application Publication 2003/0202594, and thus the '808 Patent, was essential to the H.264 Standard and agreed to license it and its international counterparts on RAND terms. Moreover, via this Declaration Form, Nokia agreed it would offer to license on RAND terms any patent(s) and patent application(s) essential to implementing the H.264 Standard.[44]

123.    On December 15, 2014, after the first version of the H.265 Standard was published, Kalle Moilanen signed a "Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation | ISO/IEC Deliverable" on behalf of Nokia Corporation, in Salo, Finland. Ex. M [Declaration H265-21]. Nokia submitted this Declaration Form to the ITU, ISO, and/or IEC. In this Declaration Form, Nokia declared that it believed the '808 Patent was essential to the H.265 Standard and agreed to license it and its international counterparts on RAND terms. Moreover, via

---

[44] Each H.264 Declaration includes the same commitment, which Warner Bros. does not re-state in each instance for brevity only.

this Declaration Form, Nokia agreed it would offer to license on RAND terms any patent(s) and patent application(s) essential to implementing the H.265 Standard.[45]

124.    On information and belief, and as made clear by Nokia's subsequent conduct, Nokia never intended to honor these commitments, which were made to induce the Coding Standards SSOs to continue to include features allegedly covered by the '808 Patent in future versions of the H.264 and H.265 Standards.

125.    Despite its above commitments, Nokia now refuses to offer Warner Bros. a RAND rate for alleged use of the '808 Patent, while simultaneously basing its infringement allegations on the fact that Warner Bros.' streaming services encode videos in standard-compliant formats. *E.g.*, Complaint, Ex. 14 (accusing Warner Bros.' platform because "the downloaded bitstream is in an H.264-compliant format").

### ii.    *6,950,469*

126.    U.S. Patent No. 6,950,469 (the "'469 Patent") is titled "Method for Sub-Pixel Value Interpolation," and names Marta Karczewicz and Antti Olli Hallapuro as inventors. Marta Karczewicz's location was identified as Irving, Texas.

127.    The '469 Patent names Nokia Corporation as the original assignee. Upon information and belief, Nokia Technologies Oy is the '469 Patent's current assignee.

128.    The '469 Patent was issued on September 27, 2005, from an application filed on September 17, 2001, and purports to claim priority to that date.

129.    On June 26, 2007, after the first version of the H.264 Standard was published, Stephan Wenger signed a "Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation | ISO/IEC Deliverable" on behalf of Nokia Corporation, in Palo Alto, California.

---

[45] Each H.265 Declaration includes the same commitment, which Warner Bros. does not re-state in each instance for brevity only.

Ex. H [Declaration H264-80]. Nokia submitted this Declaration Form to the ITU, ISO, and/or IEC. In this Declaration Form, Nokia declared that it believed the '469 Patent was essential to the H.264 Standard and agreed to license it and its international counterparts on RAND terms.

130.    On information and belief, and as made clear by Nokia's subsequent conduct, Nokia never intended to honor these commitments, which were made to induce the Coding Standards SSOs to continue to include features allegedly covered by the '469 Patent in future versions of the H.264 Standard.

131.    Despite its above commitments, Nokia now refuses to offer Warner Bros. a RAND rate for alleged use of the '469 Patent, while simultaneously basing its infringement allegations on the fact that Warner Bros. streaming services encode videos in a H.264-compliant format. *E.g.*, Complaint, Ex. 15 (accusing Warner Bros.' platform because "the downloaded bitstream is in an H.264-compliant format").

### iii.    8,175,148

132.    U.S. Patent No. 8,175,148 (the "'148 Patent") is titled "Method and Device for Indicating Quantizer Parameters in a Video Coding System," and names Jani Lainema as the inventor, whose location was identified as Irving, Texas.

133.    The '148 Patent names Nokia Corporation as the original assignee. Upon information and belief, Nokia Technologies Oy is the '148 Patent's current assignee.

134.    The '148 Patent was issued on May 8, 2012, from U.S. Patent Application No. 11/881367, filed on July 26, 2007, and purports to claim priority to April 23, 2002.

135.    On April 4th, 2011, after the first version of the H.264 Standard was published, Kalle Moilanen signed a "Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation | ISO/IEC Deliverable" on behalf of Nokia Corporation, in Salo, Finland. Ex. C [Declaration H264-103]. Nokia submitted this Declaration Form to the ITU, ISO, and/or IEC. In

this Declaration Form, Nokia declared that it believed U.S. Patent Application No. 11/881367, and thus the '148 Patent, was essential to the H.264 Standard and agreed to license it and its international counterparts on RAND terms.

136.    On December 15, 2014, after the first version of the H.265 Standard was published, Kalle Moilanen signed a "Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation | ISO/IEC Deliverable" on behalf of Nokia Corporation, in Salo, Finland. Ex. M [H265-21]. Nokia submitted this Declaration Form to the ITU, ISO, and/or IEC. In this Declaration Form, Nokia declared that it believed the '148 Patent was essential to the H.265 Standard and agreed to license it and its international counterparts on RAND terms.

137.    On information and belief, and as made clear by Nokia's subsequent conduct, Nokia never intended to honor these commitments, which were made to induce the Coding Standards SSOs to continue to include features allegedly covered by the '148 Patent in future versions of the H.264 and H.265 Standards.

138.    Despite its above commitments, Nokia now refuses to offer Warner Bros. a RAND rate for alleged use of the '148 Patent, while simultaneously basing its infringement allegations on the fact that Warner Bros. streaming services encode videos in standard-compliant formats. *E.g.*, Complaint, Ex. 16 (accusing Warner Bros.' platform because "the downloaded bitstream is in an H.264-compliant format").

### *iv.    8,050,321*

139.    U.S. Patent No. 8,050,321 (the "'321 Patent") is titled "Grouping of Image Frames in Video Coding," and names Miska Hannuksela as the inventor.

140.    The '321 Patent names Nokia Corporation as the original assignee. Upon information and belief, Nokia Technologies Oy is the '321 Patent's current assignee.

141.    The '321 Patent was issued on November 1, 2011, from an application filed on January 25, 2006, and purports to claim priority to January 23, 2002. The '321 Patent was granted following U.S. Patent Application Publication 2006/0120451.

142.    On April 10, 2007, after the first version of the H.264 Standard was published, Stephan Wenger signed a "Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation | ISO/IEC Deliverable" on behalf of Nokia Corporation, in Palo Alto, California. Ex. K [Declaration H264-83]. Nokia submitted this Declaration Form to the ITU, ISO, and/or IEC. In this Declaration Form, Nokia declared that it believed U.S. Patent Application Publication 2006/0120451, and thus the '321 Patent, was essential to the H.264 Standard and agreed to license it and its international counterparts on RAND terms.

143.    On June 11, 2013, after the first version of the H.265 Standard was published, Kalle Moilanen signed a "Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation | ISO/IEC Deliverable" on behalf of Nokia Corporation, in Salo, Finland. Ex. N [Declaration H265-08]. Nokia submitted this Declaration Form to the ITU, ISO, and/or IEC. In this Declaration Form, Nokia declared that it believed the '321 Patent was essential to the H.265 Standard and agreed to license it and its international counterparts on RAND terms.

144.    On information and belief, and as made clear by Nokia's subsequent conduct, Nokia never intended to honor these commitments, which were made to induce the Coding Standards SSOs to continue to include features allegedly covered by the '321 Patent in future versions of the H.264 and H.265 Standards.

145.    Despite its above commitments, Nokia now refuses to offer Warner Bros. a RAND rate for alleged use of the '321 Patent, while simultaneously basing its infringement allegations on the fact that Warner Bros. streaming services encode videos in standard-compliant formats. *E.g.*,

Complaint, Ex. 17 (accusing Warner Bros.' platform because "the downloaded bitstream is in an H.264-compliant format"), Ex. 18 (accusing Warner Bros.' platform because "the downloaded bitstream is in an H.265-compliant format").

### v.    7,289,674

146.    U.S. Patent No. 7,289,674 (the "'674 Patent") is titled "Spatial Prediction Based Intra Coding," and names Marta Karczewicz as the inventor, whose location was identified as Irving, Texas.

147.    The '674 Patent names Nokia Corporation as the original assignee. Upon information and belief, Nokia Technologies Oy is the '674 Patent's current assignee.

148.    The '674 Patent was issued on October 30, 2007, from an application filed on June 10, 2003, and purports to claim priority to June 11, 2002.

149.    On December 21, 2007, after the first version of the H.264 Standard was published, Stephan Wenger signed a "Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation | ISO/IEC Deliverable" on behalf of Nokia Corporation, in Palo Alto, California. Ex. F [Declaration H264-87]. Nokia submitted this Declaration Form to the ITU, ISO, and/or IEC. In this Declaration Form, Nokia declared that it believed the '674 Patent was essential to the H.264 Standard and agreed to license it and its international counterparts on RAND terms.

150.    On December 15, 2014, after the first version of the H.265 Standard was published, Kalle Moilanen signed a "Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation | ISO/IEC Deliverable" on behalf of Nokia Corporation, in Salo, Finland. Ex. M [Declaration H265-21]. Nokia submitted this Declaration Form to the ITU, ISO, and/or IEC. In this Declaration Form, Nokia declared that it believed the '674 Patent was essential to the H.265 Standard and agreed to license it and its international counterparts on RAND terms.

151.    On information and belief, and as made clear by Nokia's subsequent conduct, Nokia never intended to honor these commitments, which were made to induce the Coding Standards SSOs to continue to include features allegedly covered by the '674 Patent in future versions of the H.264 and H.265 Standards.

152.    Despite its above commitments, Nokia now refuses to offer Warner Bros. a RAND rate for alleged use of the '674 Patent, while simultaneously basing its infringement allegations on the fact that Warner Bros. streaming services encode videos in standard-compliant formats. *E.g.*, Complaint, Ex. 19 (accusing Warner Bros.' platform because "the downloaded bitstream is in an H.264-compliant format").

### vi.    6,968,005

153.    U.S. Patent No. 6,968,005 (the "'005 Patent") is titled "Video Coding," and names Miska Hannuksela as the inventor.

154.    The '005 Patent names Nokia Mobile Phones Limited as the original assignee. Upon information and belief, Nokia Corporation was the assignee of the Patent prior to March 19, 2007, when it declared the patent essential to the H.264 Standard. Upon information and belief, Nokia Technologies Oy is the '005 Patent's current assignee.

155.    The '005 Patent was issued on November 22, 2005, from an application filed on May 15, 2001, and purports to claim priority to May 15, 2000.

156.    On March 19, 2007, after the first version of the H.264 Standard was published, Jari Vaario signed a "Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation | ISO/IEC Deliverable" on behalf of Nokia Corporation, in Espoo, Finland. Ex. J [Declaration H264-78]. Nokia submitted this Declaration Form to the ITU, ISO, and/or IEC. In this Declaration Form, Nokia declared that it believed the '005 Patent was essential to the H.264 Standard and agreed to license it and its international counterparts on RAND terms.

157.    On June 11, 2013, after the first version of the H.265 Standard was published, Kalle Moilanen signed a "Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation | ISO/IEC Deliverable" on behalf of Nokia Corporation, in Salo, Finland. Ex. N [Declaration H265-08]. Nokia submitted this Declaration Form to the ITU, ISO, and/or IEC. In this Declaration Form, Nokia declared that it believed the '005 Patent was essential to the H.265 Standard and agreed to license it and its international counterparts on RAND terms.

158.    On information and belief, and as made clear by Nokia's subsequent conduct, Nokia never intended to honor these commitments, which were made to induce the Coding Standards SSOs to continue to include features allegedly covered by the '005 Patent in future versions of the H.264 and H.265 Standards.

159.    Despite its above commitments, Nokia now refuses to offer Warner Bros. a RAND rate for alleged use of the '005 Patent, while simultaneously basing its infringement allegations on the fact that Warner Bros. streaming services encode videos in standard-compliant formats. *E.g.*, Complaint, Ex. 20 (accusing Warner Bros.' platform because "the downloaded bitstream is in an H.264-compliant format").

### vii.    6,711,211

160.    U.S. Patent No. 6,711,211 (the "'211 Patent") is titled "Method for Encoding and Decoding Video Information, A Motion Compensated Video Encoder and a Corresponding Decoder," and names Jani Lainema as the inventor, whose location was identified as Irving, Texas.

161.    The '211 Patent names Nokia Mobile Phones Ltd. as the original assignee. Upon information and belief, Nokia Corporation was the assignee of the Patent prior to December 21, 2014, when it declared the patent essential to the H.264 Standard. Upon information and belief, Nokia Technologies Oy is the '211 Patent's current assignee.

162.    The '211 Patent was issued on March 23, 2004, from an application filed on May 8, 2000, and purports to claim priority to that date.

163.    On December 15, 2014, after the first version of the H.265 Standard was published, Kalle Moilanen signed a "Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation | ISO/IEC Deliverable" on behalf of Nokia Corporation, in Salo, Finland. Ex. M [Declaration H265-21]. Nokia submitted this Declaration Form to the ITU, ISO, and/or IEC. In this Declaration Form, Nokia declared that it believed the '211 Patent was essential to the H.265 Standard and agreed to license it and its international counterparts on RAND terms.

164.    On information and belief, and as made clear by Nokia's subsequent conduct, Nokia never intended to honor these commitments, which were made to induce the Coding Standards SSOs to continue to include features allegedly covered by the '211 Patent in future versions of the H.264 and H.265 Standards.

165.    Despite its above commitments, Nokia now refuses to offer Warner Bros. a RAND rate for alleged use of the '211 Patent, while simultaneously basing its infringement allegations on the fact that Warner Bros. streaming services encode videos in standard-compliant formats. *E.g.*, Complaint, Ex. 21 (accusing Warner Bros.' platform because "the downloaded bitstream is in an H.264-compliant format").

166.    Furthermore, because Nokia never disclosed or declared the '211 Patent during the H.264 standardization process, Nokia breached its obligation to timely disclose its intellectual property and has therefore waived its right to assert the patent against H.264-compliant encoders.

### *viii.    8,005,145*

167.    U.S. Patent No. 8,005,145 (the "'145 Patent") is titled "Method and Apparatus for Transferring Video Frame in Telecommunication System," and names Jani Lainema as the inventor, whose location was identified as Irving, Texas.

168.    The '145 Patent names Nokia Corporation as the original assignee. Upon information and belief, Nokia Technologies Oy is the '145 Patent's current assignee.

169.    The '145 Patent was issued on August 23, 2011, from an application filed on July 6, 2004, and purports to claim priority to August 11, 2000.

170.    On June 11, 2013, after the first version of the H.265 Standard was published, Kalle Moilanen signed a "Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation | ISO/IEC Deliverable" on behalf of Nokia Corporation, in Salo, Finland. Ex. N [Declaration H265-08]. Nokia submitted this Declaration Form to the ITU, ISO, and/or IEC. In this Declaration Form, Nokia declared that it believed the '145 Patent was essential to the H.265 Standard and agreed to license it and its international counterparts on RAND terms.

171.    On information and belief, and as made clear by Nokia's subsequent conduct, Nokia never intended to honor these commitments, which were made to induce the Coding Standards SSOs to continue to include features allegedly covered by the '145 Patent in future versions of the H.264 and H.265 Standards.

172.    Despite its above commitments, Nokia now refuses to offer Warner Bros. a RAND rate for alleged use of the '145 Patent, while simultaneously basing its infringement allegations on the fact that Warner Bros. streaming services encode videos in standard-compliant formats. *E.g.*, Complaint, Ex. 22 (accusing Warner Bros.' platform because "the downloaded bitstream is in an H.264-compliant format").

173.    Furthermore, because Nokia never disclosed or declared the '145 Patent during the H.264 standardization process, Nokia breached its obligation to timely disclose its intellectual property and has therefore waived its right to assert the patent against H.264-compliant encoders.

### ix.    9,800,891

174.    U.S. Patent No. 9,800,891 (the "'891 Patent") is titled "Method and Associated Device for Filtering Digital Video Images," and names Ossi Kalevo, Emre Aksu, and Marta Karczewicz as the inventors. Marta Karczewicz's location was identified as Irving, Texas.

175.    The '891 Patent names Nokia Technologies Oy as the original assignee. Upon information and belief, the '891 Patent is still assigned to Nokia Technologies Oy.

176.    The '891 Patent was issued on October 24, 2017, from U.S. Patent Application No. 09/766035, filed on January 19, 2001, and purports to claim priority to January 20, 2000. The '891 Patent was granted following U.S. Patent Application Publication 2001/0017944.

177.    On December 21, 2007, after the first version of the H.264 Standard was published, Stephan Wenger signed a "Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation | ISO/IEC Deliverable" on behalf of Nokia Corporation, in Palo Alto, California. Ex. G [Declaration H264-89]. Nokia submitted this Declaration Form to the ITU, ISO, and/or IEC. In this Declaration Form, Nokia declared that it believed U.S. Patent Application Publication 2001/0017944, and thus the '891 Patent, was essential to the H.264 Standard and agreed to license it and its international counterparts on RAND terms.

178.    On December 15, 2014, after the first version of the H.265 Standard was published, Kalle Moilanen signed a "Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation | ISO/IEC Deliverable" on behalf of Nokia Corporation, in Salo, Finland. Ex. M [Declaration H265-21]. Nokia submitted this Declaration Form to the ITU, ISO, and/or IEC. In this Declaration Form, Nokia declared that it believed U.S. Patent Application No. 09/766035, and therefore the '891 Patent, was essential to the H.265 Standard and agreed to license it and its international counterparts on RAND terms.

179. On information and belief, and as made clear by Nokia's subsequent conduct, Nokia never intended to honor these commitments, which were made to induce the Coding Standards SSOs to continue to include features allegedly covered by the '891 Patent in future versions of the H.264 and H.265 Standards.

180. Despite its above commitments, Nokia now refuses to offer Warner Bros. a RAND rate for alleged use of the '891 Patent, while simultaneously basing its infringement allegations on the fact that Warner Bros. streaming services encode videos in standard-compliant formats. *E.g.*, Complaint, Ex. 23 (accusing Warner Bros.' platform because "the downloaded bitstream is in an H.264-compliant format").

### x.    6,856,701

181. U.S. Patent No. 6,856,701 (the "'701 Patent") is titled "Method and System for Context-Based Adaptive Binary Arithmetic Coding," and names Marta Karczewicz and Ragip Kurceren as the inventors, whose locations were identified as Irving, Texas.

182. The '701 Patent names Nokia Corporation as the original assignee. Upon information and belief, Nokia Technologies Oy is the '701 Patent's current assignee.

183. The '701 Patent was issued on February 15, 2005, from an application filed on November 27, 2001, and purports to claim priority to September 14, 2001.

184. On October 11, 2010, after the first version of the H.264 Standard was published, Kalle Moilanen signed a "Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation | ISO/IEC Deliverable" on behalf of Nokia Corporation, in Salo, Finland. Ex. D [Declaration H264-98]. Nokia submitted this Declaration Form to the ITU, ISO, and/or IEC. In this Declaration Form, Nokia declared that it believed the '701 Patent was essential to the H.264 Standard and agreed to license it and its international counterparts on RAND terms.

185.    On December 1, 2021, after the first version of the H.265 Standard was published, Teemu Itälä and Jeremie Vaquer signed a "Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation | ISO/IEC Deliverable" on behalf of Nokia Technologies Oy in Espoo, Finland. Ex. L [Declaration H265-66]. Nokia submitted this Declaration Form to the ITU, ISO, and/or IEC. In this Declaration Form, Nokia declared that it believed the '701 Patent was essential to the H.265 Standard and agreed to license it and its international counterparts on RAND terms.

186.    On information and belief, and as made clear by Nokia's subsequent conduct, Nokia never intended to honor these commitments, which were made to induce the Coding Standards SSOs to continue to include features allegedly covered by the '701 Patent in future versions of the H.264 and H.265 Standards.

187.    Despite its above commitments, Nokia now refuses to offer Warner Bros. a RAND rate for alleged use of the '701 Patent, while simultaneously basing its infringement allegations on the fact that Warner Bros. streaming services encode videos in standard-compliant formats. *E.g.*, Complaint, Ex. 24 (accusing Warner Bros.' platform because "the downloaded bitstream is in an H.264-compliant format").

### *xi.    8,107,744*

188.    U.S. Patent No. 8,107,744 (the "'744 Patent") is titled "Picture Buffering for Prediction References and Display," and names Dong Tian, Miska Hannuksela, and Ye-Kui Wang, as the inventors.

189.    The '744 Patent names Nokia Corporation as the original assignee. Upon information and belief, Nokia Technologies Oy is the '744 Patent's current assignee.

190.    The '744 Patent was issued on January 31, 2012, from U.S. Application 10/703109, filed on November 6, 2003, and purports to claim priority to November 6, 2002.

191.    On March 25, 2009, after the first version of the H.264 Standard was published, Kalle Moilanen signed a "Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation | ISO/IEC Deliverable" on behalf of Nokia Corporation, in Salo, Finland. Ex. E [Declaration H264-94]. Nokia submitted this Declaration Form to the ITU, ISO, and/or IEC. In this Declaration Form, Nokia declared that it believed U.S. Application 10/703109, and therefore the '744 Patent, was essential to the H.264 Standard and agreed to license it and its international counterparts on RAND terms.

192.    On June 11, 2013, after the first version of the H.265 Standard was published, Kalle Moilanen signed a "Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation | ISO/IEC Deliverable" on behalf of Nokia Corporation, in Salo, Finland. Ex. N [Declaration H265-08]. Nokia submitted this Declaration Form to the ITU, ISO, and/or IEC. In this Declaration Form, Nokia declared that it believed the '744 Patent was essential to the H.265 Standard and agreed to license it and its international counterparts on RAND terms.

193.    On information and belief, and as made clear by Nokia's subsequent conduct, Nokia never intended to honor these commitments, which were made to induce the Coding Standards SSOs to continue to include features allegedly covered by the '744 Patent in future versions of the H.264 and H.265 Standards.

194.    Despite its above commitments, Nokia now refuses to offer Warner Bros. a RAND rate for alleged use of the '744 Patent, while simultaneously basing its infringement allegations on the fact that Warner Bros. streaming services encode videos in standard-compliant formats. *E.g.*, Complaint, Ex. 25 (accusing Warner Bros.' platform because "the downloaded bitstream is in an H.264-compliant format").

*xii.*    *9,571,833*

195.    U.S. Patent No. 9,571,833 (the "'833 Patent") is titled "Method for Coding and an Apparatus," and names Mehmet Oguz Bici, Jani Lainema, and Kemal Ugur as the inventors.

196.    The '833 Patent names Nokia Technologies Oy as the original assignee. Upon information and belief, Nokia Technologies Oy is the '833 Patent's current assignee.

197.    The '833 Patent was issued on February 14, 2017, from U.S. Application 13/666,680, filed on November 1, 2012, and purports to claim priority to November 4, 2011.

198.    On June 11, 2013, after the first version of the H.265 Standard was published, Kalle Moilanen signed a "Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation | ISO/IEC Deliverable" on behalf of Nokia Corporation, in Salo, Finland. Ex. N [Declaration H265-08]. Nokia submitted this Declaration Form to the ITU, ISO, and/or IEC. In this Declaration Form, Nokia declared that it believed U.S. Application 13/666,680, and therefore the '833 Patent, was essential to the H.265 Standard and agreed to license it and its international counterparts on RAND terms.

199.    On information and belief, and as made clear by Nokia's subsequent conduct, Nokia never intended to honor these commitments, which were made to induce the Coding Standards SSOs to continue to include features allegedly covered by the '833 Patent in future versions of the H.264 and H.265 Standards.

200.    Despite its above commitments, Nokia now refuses to offer Warner Bros. a RAND rate for alleged use of the '833 Patent, while simultaneously basing its infringement allegations on the fact that Warner Bros. streaming services encode videos in standard-compliant formats. *E.g.*, Complaint, Ex. 26 (accusing Warner Bros.' platform because "the downloaded bitstream is in an H.265-compliant format").

### xiii.    10,523,960

201.    U.S. Patent No. 10,523,960 (the "'960 Patent") is titled "Motion Prediction in Video Coding," and names Kemal Ugur, Jani Lainema, and Antti Hallapuro as the inventors.

202.    The '960 Patent names Nokia Technologies Oy as the original assignee. Upon information and belief, Nokia Technologies Oy is the '960 Patent's current assignee.

203.    The '960 Patent was issued on December 31, 2019, from an application filed on January 22, 2018, and purports to claim priority to January 7, 2011.

204.    Despite its above commitments to offer to license on RAND terms any patent(s) and patent application(s) essential to implementing the H.265 Standard, Nokia now refuses to offer Warner Bros. a RAND rate for alleged use of the '960 Patent, while simultaneously basing its infringement allegations on the fact that Warner Bros. streaming services encode videos in standard-compliant formats. *E.g.*, Complaint, Ex. 26 (accusing Warner Bros.' platform because "the downloaded bitstream is in an H.265-compliant format").

205.    Furthermore, because Nokia never disclosed or declared the '960 Patent during the H.265 standardization process, Nokia breached its obligation to timely disclose its intellectual property and has therefore waived its right to assert the patent against H.265-compliant encoders.

### E.  Nokia's Anticompetitive Deceit Caused the Coding Standards SSOs To Exclude Alternative Technologies from the Coding Standards

206.    Nokia's false General Patent Statement, its deliberate failure to disclose its patents, and its false RAND declarations had two primary effects that enabled Nokia's illegal monopolization and patent hold-up scheme. First, the declarations induced the Coding Standards SSOs to standardize and continue to standardize technology potentially covered by Nokia's patents and/or patent applications in the Coding Standards, as opposed to selecting competing alternative technology or abandoning further standardization efforts altogether as to related functions. Nokia

knew that if it timely disclosed its allegedly essential patents and forthrightly stated its intention

not to license them on RAND terms, Paragraph 2.3 of the Patent Policy would cause the Coding

Standards SSOs to (i) abandon any further standard or release based upon Nokia's technology, and

(ii) potentially turn to a competing technology for standardization instead.

207.    Second, the declarations induced implementers of the Coding Standards to continue

to invest in developing standard-compliant devices or services, thereby making themselves more

vulnerable to a hold-up campaign. And in particular, Nokia's declaration of encoding-only patents

and patents that included encoding claims as standard essential, induced implementers like Warner

Bros. to invest in the technology under the assumption that, should a license be needed from Nokia

for video encoding, Nokia would grant one on RAND terms. In reasonable reliance upon Nokia's

contractual commitments to license its patents on RAND terms, market participants like Warner

Bros. expended substantial resources in research, development, and marketing of products and

services designed to be compatible with video coding technologies, like the Coding Standards.

208.    For each of Nokia's deliberately nondisclosed and/or declared-essential patents, on

information and belief, the Coding Standards SSOs had multiple viable alternative technologies.

*Ericsson, Inc. v. D-Link Sys., Inc.,* 773 F.3d 1201, 1233 (Fed. Cir. 2014) ("When a technology is

incorporated into a standard, it is typically chosen from among different options."). Yet, instead of

standardizing one of these alternative technologies or leaving the relevant functionality out of the

standard, the Coding Standards SSOs standardized technology Nokia now claims is covered by its

patents, including the Asserted Patents.

209.    Nokia never intended to license any of its coding patents on RAND terms. Instead,

it intended to induce the Coding Standards SSOs to standardize or continue standardizing

technology related to its patents and/or patent applications; to steer the Coding Standards SSOs

away from selecting competing alternative technologies for adoption into the Coding Standards and later editions; and to lay the groundwork for a hold-up campaign. Nokia concealed its true objectives from the Coding Standards SSOs—to monopolize the markets for standardized technology, to engage in hold-up, to deny that it owed any obligation to license its encoding patent claims on RAND terms, and to insist on supra-RAND royalties and non-RAND terms in licensing negotiations, including negotiations directed to decoding claims, which Nokia contends are standard essential.

## VI.    THE MPEG/VIA LA H.264 PATENT POOL REFLECTS A BASELINE RAND RATE FOR CODING STANDARDS SEPs

210.    Patent pools are created by two or more SEP owners or by an administrator of a prospective patent pool who collects SEP owners to act as licensors with the purpose of licensing SEPs to third-party licensees, and usually to the other licensors, in a single licensing package. Patent pools are also independent from SSOs. Participation in a patent pool is voluntary.

211.    Patent pools generally distribute royalties on a per patent basis as part of a patent-counting system. This structure generally provides equal compensation for any given patent in the pool.

212.    The MPEG/Via LA[46] AVC/H.264 Patent Pool provides a strong indicator of RAND Rates for Coding SEPs.

213.    The MPEG/Via LA AVC/H.264 Patent pool's final license terms were first announced in 2004.[47]

---

[46] MPEG LA and Via Licensing Alliance merged in 2023 and are now Via LA. Angela Morris, *Via Licensing acquires MPEG LA in patent pool merger first*, IAM-MEDIA (May 2, 2023) available at https://www.iam-media.com/article/licensing-acquires-mpeg-la (last visited December 22, 2025).

[47] *See, e.g.*, TVTech, *MPEG LA announces final AVC/H.264 license terms*, available at https://www.tvtechnology.com/news/mpeg-la-announces-final-avch264-license-terms    (last visited December 22, 2025).

214.    Nokia's own employees ██████████████████, who have previously worked at MPEG LA, have admitted that MPEG LA's licensing program "has become the template for addressing standard essential patent thickets."[48]

215.    Generally, MPEG LA would announce a call for essential patents for a specific standardized technology, such as H.264/AVC or H.265/HEVC, that would benefit from a patent pool "because of thicket issues" to determine whether certain patent owners would agree to terms necessary to form the pool.[49] Next, an "independent patent expert" reviews patents submitted by owners to determine whether those patents are essential to the standard.[50] Companies determined to have SEPs are invited to meetings to agree on standard terms to license their essential patents. They then authorize MPEG LA to offer those essential patents under the agreed upon terms of a license.[51] Once the patent pool is organized, additional essential patents may be added if confirmed by the independent patent expert or experts to be essential.[52]

216.    On information and belief each of the patents in MPEG/Via LA's AVC patent pool has undergone this third-party review process and has been deemed essential to the standard, indicating both the scope and depth of the pool.

217.    The MPEG/Via LA AVC/H.264 pool provides RAND licenses for both encoders and decoders of AVC/H.264 content. In particular, the MPEG/Via LA AVC/H.264 pool provides a

---

[48] Managing IP, *"INTERVIEW: Tony Piotrowski of MPEG LA,"* (Aug. 18, 2014), available at https://www.managingip.com/article/2a5bqo2drurt0bx8v7tr8/interview-tony-piotrowski-of-mpeg-la (last visited December 22, 2025).
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*

license to use a "decoder, encoder or product consisting of one decoder and one encoder" for AVC content.[53]

218.    The MPEG/Via LA AVC/H.264 pool includes licenses to claims in respective patent lists, that include both encoding and decoding claims.[54]

219.    The pool royalty rate for MPEG/Via LA's AVC Patent Pool is capped at US $100,000 per year for subscription fees "where [the] end user pays for AVC video."[55]

220.    This $100,000 annual cap does not reflect the full scope of revenue generated for patent holders in the pool. Rather, "[t]o align with the real-world flow of AVC/H.264 commerce, reasonable royalties are apportioned throughout the AVC/H.264 value chain."[56] The patent pool assumes and relies on the fact that most end-user devices and operating systems implementing the AVC/H.264 Standard are separately licensed and pay per-unit royalties at significantly higher rates. As a result, patent holders receive substantial compensation from hardware manufacturers and software vendors in addition to the capped fees from content providers.

221.    The AVC pool has been "enormously successful for the market," and may be the "most widely adopted patent pool of all time with nearly 2,000 licensees and roughly 40 licensors."[57]

---

[53] Via Licensing Alliance, *AVC/H.264 License Fees*, available at https://via-la.com/licensing-programs/avc-h-264/#license-fees (last visited December 22, 2025).
[54] *See id.*
[55] *Id.*
[56] Via Licensing Alliance, *AVC/H.264 Overview*, available at https://via-la.com/licensing-programs/avc-h-264/#overview (last visited December 22, 2025).
[57] Jan Ozer, *Via LA's Heath Hoglund Talks MPEG LA/Via Licensing Patent Pool Merger*, STREAMING MEDIA (May 8, 2023), available at https://www.streamingmedia.com/Articles/ReadArticle.aspx?ArticleID=158547 (last visited December 22, 2025).

222.    The MPEG/Via LA rate has been accepted by a large number of sophisticated licensors and licensees of streaming media technologies (e.g., Amazon, Apple, Google, DirecTV, Hulu, Microsoft, Netflix, Sony, etc.).[58]

223.    Courts have found that the MPEG LA H.264 pool rate is a "strong indicator" of a (F)RAND royalty rate because "the characteristics of the MPEG LA H.264 pool closely align with all of the purposes of the RAND commitment."[59]

224.    Warner Bros. is a licensee of the MPEG/Via LA AVC Patent Pool, under which Warner Bros. is licensed to approximately 164 active US, EP, and BR families of AVC essential patents, totaling approximately 2,000 patents, from roughly 40 licensors.

## VII.    NOKIA TARGETED WARNER BROS. AS PART OF ITS ANTICOMPETITIVE HOLD-UP CAMPAIGN

225.    In late 2022, Nokia initiated discussions with Warner Bros. regarding the licensing of Nokia's video coding patent portfolio. Since that time, Nokia has breached its RAND obligations in numerous ways, including, for example, refusing to offer Warner Bros. a license on RAND terms to its RAND-encumbered patents in willful disregard of its commitments to the Coding Standards SSOs, their affiliates and members, and intended third-party beneficiaries, including Warner Bros.

226.    Since the start of negotiations, Warner Bros. has made clear through its conduct and statements that it is a willing licensee of SEPs that Warner Bros. is actually using.

---

[58]    *See, e.g.*, Via Licensing Alliance, *AVC/H.264 Licensors*, available at https://via-la.com/licensing-programs/avc-h-264/#licensors (last visited December 22, 2025); *see also, e.g.*, Via Licensing Alliance, *AVC/H.264 Licensees*, available at https://via-la.com/licensing-programs/avc-h-264/#licensees (last visited December 22, 2025).

[59]    *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR, 2013 WL 2111217, at *82-83 (W.D. Wash. Apr. 25, 2013).

**A. Overview of the Parties' Negotiations**

227. ██████████████████████████████████████████

████████████████████████████████████████████████

████████

228. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

229. ██████████████████████████████████████████

███████████████████████████████████████

230. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████

231. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

232. ██████████████████████████████████████████

██████████████████████████████████████

233.    At the end of the Fourth Quarter of 2023, Warner Bros. reported 97.7 million direct-to-consumer subscribers.[60]

234.    ███████████████████████████████████████████████

████████████████████

235.    ███████████████████████████████████████████████

███████████████████████████████████

236.    ███████████████████████████████████████████████

███████████████████████████████

237.    ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

238.    ███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

239.    ███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

240.    ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[60]    Warner    Bros.    Discovery,    *2023    Annual    Report*    at    8,    available    at https://s201.q4cdn.com/336605034/files/doc_financials/2023/ar/warner-bros-discovery_10-k_wr_final.pdf.

████████████████████████████████████████████████████

████████████████████████████

241.    ██████████████████████████████████████

██████████████████████████████████████

242.    ██████████████████████████████████████

████████████████████████████████████████████████

243.    ██████████████████████████████████████

█████████████████

244.    ██████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

245.    ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

246.    ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

247.    ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



248.

249.

250.

251.

252.

253.

[61] Sjoberg, R., Chen, Y., Hannuksela, M.M., et al., *Overview of HEVC High-Level Syntax and Reference Picture Management*, IEEE TRANSACTIONS ON CIRCUITS AND SYSTEMS FOR VIDEO TECHNOLOGY, Vol. 22, No. 12 (Dec. 2012), 1858, available at https://ieeexplore.ieee.org/stamp/stamp.jsp?tp=&arnumber=6324417.

254. ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████

255. ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

256. ███████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████

257. Nokia ███████████████ chose to launch its global litigation campaign. Nokia filed suit ██████████████████████████████ on midnight October 31, 2025.

258. As of the end of the Third Quarter of 2025, Warner Bros. reported 128.0 million streaming subscribers.[62] ██████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████

[62] Warner Bros. Discovery, *Warner Bros. Discovery Reports Third-Quarter 2025 Results* at 1, available at https://s201.q4cdn.com/336605034/files/doc_earnings/2025/q3/earnings-result/WBD-3Q25-Earnings-Release.pdf.

**B.  Nokia has Breached Its Contractual Obligation to License Its Coding Patents on the Promised Terms and Conditions in Numerous Ways**

*i.    Nokia Has Refused to License Its Encoding Patent Claims on RAND Terms*

259.    Since initiating negotiations, Nokia has steadfastly refused to make Warner Bros. an offer to license on RAND terms any Nokia encoding patent claims that Warner Bros. may need to supply standard compliant video, despite Warner Bros.' specific request for such a RAND license. Nokia has taken the position that it is not obligated to offer or grant Warner Bros. a license to any such patents on a worldwide, non-discriminatory basis and on reasonable terms and conditions to make, use, and supply encoding implementations of the Coding Standards. Instead, Nokia asserts that its encoding patent claims are not RAND-encumbered and that it can insist upon whatever royalty it wants for those patents.

260.    Unsurprisingly given its position, Nokia demanded license terms and conditions that grossly exceed any possible RAND level. For example, ███████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████

261.    Nokia cannot show that its license offers to Warner Bros. are reasonable based on the ex ante value of its alleged SEPs (and Nokia rejects the proposition that it must offer a license based upon that ex ante value). In addition, hundreds of other entities own thousands of patents declared essential to the Coding Standards. No entity could realistically make, use, offer for sale, or sell products or services practicing the Coding Standards if subjected to licensing demands from all SEP holders on the scale of Nokia's demands.

262.     Nokia has publicly stated that an SEP owner should provide an "explanation of why the SEP owner believes its offer is FRAND."[63] Yet, contrary to its admitted obligations, Nokia has not provided any legal or factual basis supporting its belief that its offer is RAND. ████████

████████████████████████████████████████████████████

Nokia has chosen an arbitrary rate it desires to extract from Warner Bros.

263.     ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

264.     Nokia is aware that all the video content that Warner Bros. makes available on its streaming platform is compliant with one or both Coding Standards. Because Nokia knows Warner Bros. is locked into the Coding Standards, Nokia has abused its monopoly power by seeking to exclude Warner Bros.' video streaming services from multiple markets around the world—without ever having made a licensing offer on RAND terms. This is because Nokia improperly seeks to abuse the leverage it stands to gain from a foreign injunction in some of Warner Bros.' largest markets as a means of forcing Warner Bros. to pay supra-RAND royalty rates.

### ii.    *Nokia Has Refused to License Its Decoding Patent Claims on RAND Terms*

265.     Nokia has also specifically breached its RAND obligations with respect to its decoding patent claims, which Nokia itself contends are essential to the Coding Standards and thus RAND-encumbered per Nokia's own position. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[63] Ex. A [Nokia, SEP Licensing Q&A (2023)] at 8.

266. ██████████████████████████████████████

██████████████████████████

267.    Nokia's license terms and conditions for just its decoding claims grossly exceed any possible RAND level. For example, ██████████████████████████████████████████████████████████████████████████████████████████

268.    Moreover, ████████████████████████████████████████████████████████████████████████████████████████████ This behavior was itself a RAND violation as it is contrary to Nokia's obligation to negotiate transparently and willingly.

269.    As noted above, Nokia has publicly stated that an SEP owner should provide an "explanation of why the SEP owner believes its offer is FRAND."[64] Yet, contrary to its admitted obligations, Nokia has not provided any legal or factual basis supporting its belief that its offer is RAND. ████████████████████████████████████ Nokia has chosen an arbitrary rate it desires to extract from Warner Bros.

270.    ████████████████████████████████████████████████████████████████████

---

[64] *Id.*

███████████████████████████████████████████████████████████████

████████████████████████████████

### iii.    Nokia's Use of Injunction Threats to Enforce Its Abusive and Monopolistic Licensing Demands

271.    Nokia supports its hold-up and discrimination against implementers of the Coding Standards, like Warner Bros., by threatening them with exclusion from major global markets.

███████████████████████████████████████████████████████████████

██ massive global litigation campaign that it has now launched. In addition to this case, Nokia has so far filed several patent infringement cases against Warner Bros. in the Unified Patent Court, Munich Regional Court, and Brazil—each asking for injunctive relief that would, in effect, completely exclude Warner Bros.' streaming services from those markets. Nokia has attempted to obtain improper leverage by seeking injunctive relief, and is attempting to coerce Warner Bros. into capitulating and paying excessive, supra-RAND royalties.

272.    This is not an isolated incident, but the cornerstone of Nokia's hold-up strategy. Nokia has a known practice of springing widespread litigation campaigns on entities who have disagreed with Nokia's supra-RAND licensing demands. Recently, Nokia launched a global litigation campaign against Paramount, a similarly situated company to Warner Bros., in this District, Brazil, Germany, and the Unified Patent Court. As another example, in recent years, Nokia sued Acer, ASUS, and Hisense, in multiple U.S. and worldwide fora after those companies would not agree to Nokia's demands. Nokia previously launched similar litigation campaigns against others such as Amazon, HP, HTC, Lenovo, Oppo, and Apple. Indeed, Nokia is among the most litigious essential patent holders in the world.[65]

---

[65] *See, e.g.*, Tim Pohlmann, *SEP Litigation Trends: What Does the Data Say?* at Fig. 6 (April 2021), available at https://www.lexisnexisip.com/wp-content/uploads/2023/09/SEP-litigation-trends-_What-does-the-data-say_IPlytics.pdf.

273. The goal of Nokia's abusive playbook is clear: although all it desires is monetary compensation, it has threatened Warner Bros. with injunctions in countries with permissive injunction standards to, in effect, completely exclude Warner Bros.' streaming services from those markets.

274. 

275. Nokia's global litigation campaign against Warner Bros. further confirms its intent to circumvent its RAND commitments. Nokia surrendered the right to exclude standard implementers who are willing and able to license on RAND terms. Nokia's RAND obligations are intended to guarantee that Nokia would not attempt to keep would-be implementers from using its

patented material, such as by seeking an injunction, but would instead offer licenses on RAND terms consistent with its commitment to the Coding Standards SSOs.

276.    Nokia intends the ongoing threats to Warner Bros.' video-streaming business, as well as the cost associated with multi-front litigation, to force Warner Bros. to capitulate to Nokia's supra-RAND royalty demands and the other abusive and anticompetitive aspects of its licensing demands. In addition, the threat of exclusion from major streaming markets puts at risk the revenue stream and investment for all of Warner Bros.' streaming businesses, not just the portion attributable to the specific foreign jurisdictions—though those alone would be significant.

277.    The magnitude of the potential lost investment and revenue flowing from an exclusionary remedy is so extreme that Warner Bros. and other would-be licensees in the same position can be strong-armed into submitting to Nokia's excessive and discriminatory demands. Any loss of market share, goodwill, and reputation would be irreparable.

### iv. Nokia Required Secrecy to Hide Its Discriminatory Royalty Demands

278.    On information and belief, Nokia has required would-be licensees to its video coding portfolio to agree to secrecy as a precondition for any licenses, licensing proposals, and related discussions. *See, e.g.*, Complaint, *Element Television Co., LLC v. Nokia Corp.*, No. 0:24-cv-04269 (D. Minn. Nov. 25, 2024) ("Nokia requested Element enter into a non-disclosure agreement (NDA) before Nokia would provide additional information about its licensing demands.").

279.    Nokia shrouds its licensing negotiations and agreements under a veil of secrecy,

████████████████████████████████████████████████

████████████████████████████████

280. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

281.    Nokia requires secrecy with the purpose and effect of furthering its patent hold-up. Secrecy enables Nokia to extract supra-RAND royalties, engage in discriminatory licensing, and to further abuse its monopoly power. Transparency in licensing of SEPs would, in contrast, enable prospective licensees to assess more effectively Nokia's non-compliance with its RAND commitments and expose its pattern and practice of violating its RAND obligations.

282.    Nokia uses the shroud of secrecy over its licensing proposals and discussions to extract monopoly rents. ████████████████████████████████████████

████████████████████████████████

### v.    *Nokia's Improper Attempts to "Double Dip" on Licensing Fees*

283.    Nokia's breach of its RAND obligations and abuse of its monopoly and market power does not end there. Nokia is additionally attempting to coerce Warner Bros. to pay for already-licensed activities.

284.    On information and belief Nokia has entered into license agreements with entities both upstream and downstream of Warner Bros. in the supply chain. As discussed above, many of these license agreements were entered into after Nokia launched global litigation campaigns seeking injunctions and exclusion orders to force a settlement. For example, on information and belief Nokia has entered into license agreements with companies, including but not limited to, Apple, HP, Amazon, Samsung, HP, and Lenovo, and other companies that sell smartphones, tablets, computers, televisions, and/or other devices in the United States wherein Nokia licensed its coding patents to those companies.

285.    These licenses cover hardware and software expressly designed for the purposes of encoding, such as products produced by Apple and Amazon, which parties like Warner Bros. can use to encode videos. For example, Apple produces a range of hardware (including laptops and desktops, such as MacBook and iMac models) for professional media workflows, as well as purpose-built systems like the Mac Studio computers, equipped with chips that provide "Hardware-accelerated H.264 [and] HEVC" encoding.[66] Apple also produces the "Compressor" software that supports "encoding jobs for a broad range of industry-standard formats, including MPEG-2, H.264, [and] HEVC."[67] As another example, Amazon sells a web service called "AWS Elemental MediaConvert," which "is a file-based video processing service that allows video providers with any size content library to easily and reliably transcode on-demand content for

---

[66] *See, e.g.*, Apple, *MacBook Pro Specs*, available at https://www.apple.com/macbook-pro/specs/ (last visited December 22, 2025); Apple, *Mac Studio Specs*, available at https://www.apple.com/mac-studio/specs/ (last visited December 22, 2025).
[67] Apple, *Final Cut Pro: Compressor*, available at https://www.apple.com/final-cut-pro/compressor/ (last visited December 22, 2025).

broadcast and multiscreen delivery" and expressly "supports the AVC [and] HEVC . . . compression standards."[68]

286.    On information and belief Nokia has licensed its coding patents to others who sell hardware and software specifically designed to enable customers to encode video in accordance with the Coding Standards.

287.    For example, █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

288.    █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[68] Amazon,    *AWS    Elemental    MediaConvert    Features*,    available    at https://aws.amazon.com/mediaconvert/features/ (last visited December 22, 2025).

289.    Although Nokia's rights have been exhausted with respect to these licensed products, Nokia contends that Warner Bros. must pay additional exorbitant royalties to Nokia to use these already-licensed products to encode video.

290.    Third-party licenses also cover the rights of Warner Bros. customers to decode video on the licensed consumer devices, like TVs. As noted, on information and belief, the streaming done by consumers is already licensed for a large segment of consumer devices, and Nokia has refused to account for that in its offers to Warner Bros.

291.    Thus, an additional aspect of Nokia's abusive patent licensing scheme is that it is attempting to "double dip" on royalty payments. Nokia has launched a global litigation campaign seeking injunctions and exclusion orders to force Warner Bros. to capitulate to double pay for already-licensed activities. Nokia leverages the monopoly power associated with its declared-essential patents to force excess licenses for all its coding patents and foist additional costs on Coding Standard implementers and end users.

## VIII.    THE RELEVANT TECHNOLOGY MARKETS

292.    For purposes of Warner Bros.' antitrust claim, the relevant markets include the markets for technologies covered by Nokia's coding patents issued in the United States and elsewhere that are essential, or are alleged to be essential, to the Coding Standards, together with all other alternative technologies to the Nokia patents that could have been used in the Coding Standards and accompanying releases (the "Relevant Technology Markets"). Nokia submitted declarations of essentiality to the Coding Standards SSOs and committed to license its patents on RAND terms, and the markets for those technologies can be identified by those licensing declarations and proposals. The relevant geographic market for licenses in the Relevant Technology Markets is global in nature.

293.    Before the Coding Standards SSOs adopted the Coding Standards and accompanying releases, competitors in the Relevant Technology Markets offered alternatives to Nokia's essential technology that performed the same or equivalent functions and could have been adopted by the Coding Standards SSOs and its members. When the Coding Standards SSOs specified Nokia's technologies in the Coding Standards and accompanying releases, however, the Coding Standards SSOs eliminated competition to those technologies, thereby vesting Nokia with monopoly power in the technology markets delimited by its SEPs. Through the standardization process and Nokia's deliberate failure to disclose its patents and false RAND commitments, implementers became locked in, and there are now no reasonably interchangeable substitute technologies with Nokia's SEPs for complying with the Coding Standards. Implementers must practice those patents to comply with the Coding Standards, and Nokia became the only commercially viable seller in the Relevant Technology Markets.

## COUNTERCLAIM I
### (Common Law Fraud)

294.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims.

295.    Nokia and its representatives to the Coding Standards SSOs failed, despite numerous opportunities and its obligation to do so, to disclose relevant patent rights to the Coding Standards SSOs during the development of the Coding Standards. Further, Nokia affirmatively misrepresented its intent to license its technologies on RAND terms by, for example, not timely disclosing and concealing its patent rights, and making false RAND commitments. On information and belief, had Nokia properly disclosed its patent rights in a timely manner, and had Nokia disclosed its true intent to assert that parties implementing the standard were not licensed and should be enjoined from selling products compliant with the Coding Standards, or otherwise would

be required to pay exorbitant license fees and accept other non-RAND terms, the Coding Standards SSOs would have decided to standardize alternative technologies to perform the relevant function and Warner Bros. would have utilized those alternative technologies. Alternatively, the Coding Standards SSOs would have continued to leave the relevant function out of the standard, in which case implementers and users of the standard, such as Warner Bros., would have been free to choose various alternative technologies to perform that function, and the Coding Standards SSOs would have been free to continue to evaluate competing alternative technologies for potential standardization in future iterations of the standard.

296.    Nokia's late disclosures and false RAND commitments proximately resulted in technology being incorporated into the Coding Standards over which Nokia now claims patent rights. Nokia's false RAND commitments also induced implementers and users of the standard, such as Warner Bros., to incorporate certain functionality into their products and services that Nokia alleges infringes its patent rights.

297.    Nokia, as part of its efforts to have its patents declared essential, falsely committed to offer licenses on RAND terms to the essential patents.

298.    Every party producing products or delivering services that support the Coding Standards, including Warner Bros., is an intended third-party beneficiary of Nokia's representations and contractual commitments to the Coding Standards SSOs.

299.    Upon information and belief, those commitments were misrepresentations that Nokia knew were false at the time they were made. And indeed, Nokia has subsequently refused to license its declared-essential patents on RAND terms, including by offering non-RAND terms, and has otherwise attempted to use its declared-essential patents as leverage in litigation.

300.    Upon information and belief, each of the above commitments and misrepresentations by Nokia and its representatives to the Coding Standards SSOs were material and false; Nokia knew these commitments and representations were material and false; the false commitments and representations were intended to induce implementers and users of the Coding Standards, such as Warner Bros., to continue to implement and use the Coding Standards; and Warner Bros. actually and justifiably relied on these commitments and misrepresentations, which caused injury.

301.    Specifically, as a direct and proximate result of the foregoing, Warner Bros. has been injured in its business or property in an amount to be determined at trial. The injury includes at least Warner Bros.' substantial investments in technologies that comply with features of the Coding Standards that Nokia now accuses of infringing its declared SEPs. Had Warner Bros. known the above commitments and representations by Nokia were false, Warner Bros. would have considered and potentially adopted alternative technology that would not incorporate the technology Nokia alleges is covered by its patent rights. Such injury further includes, but is not limited to, ongoing business uncertainties and litigation and mitigation expenses incurred by Warner Bros. as a direct result of Nokia's tactics described herein, including Nokia's baseless global litigation campaign seeking injunctions or exclusion orders.

**COUNTERCLAIM II**
**(Breach of Contract)**

302.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims as if fully set forth herein.

303.    As set forth above, through its statements and conduct, Nokia has express or implied contractual commitments with the Coding Standards SSOs and their respective members, affiliates, and/or intended third-party beneficiaries, including Warner Bros., to (1) abide by the

Patent Policy and Guidelines, and (2) offer to license on RAND terms its declared coding patents, and other coding patents and applications essential to implementing the Coding Standards (collectively, "RAND-Encumbered Patents").

304.    Every party producing products or delivering services that support the Coding Standards, including Warner Bros., is an intended third-party beneficiary of Nokia's contractual commitments to the Coding Standards SSOs.

305.    Nokia breached its contractual obligations in its conduct with Warner Bros. in multiple ways as explained above, including by refusing to offer Warner Bros. a license on RAND terms to the RAND-Encumbered Patents, failing to negotiate and act in good faith, launching a global litigation campaign with the aim of enjoining Warner Bros.' alleged implementation of H.264 and H.265 technologies, and seeking to coerce Warner Bros. into capitulating and paying excessive, non-RAND royalties. On information and belief, Nokia has also breached its contractual obligations by filing lawsuits based on RAND-Encumbered Patents that Nokia has already licensed to other entities that sell devices used for Warner Bros.' streaming services.

306.    As a result of Nokia's breach, Warner Bros. has been injured in its business or property. Nokia's refusal to offer a license to Warner Bros. on RAND terms and conditions has deprived Warner Bros. of its right to such a license, which has caused Warner Bros. to incur unnecessary costs and unwarranted harm, including but not limited to ongoing business uncertainties and litigation and mitigation expenses. The expedited injunctive relief that Nokia has sought in foreign jurisdictions is threatening Warner Bros. with immediate loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

307.    Warner Bros. has suffered damages, and will suffer further damages and irreparable harm, by reason of each and all of the acts, practices, breaches and conduct Warner Bros. alleges above until and unless the Court enjoins such acts, practices, and conduct.

308.    Moreover, Nokia's breach further constitutes waiver and/or estoppel of Nokia's rights to enforce the RAND-Encumbered Patents against any entity allegedly practicing the standard. Thus, the breach renders Nokia's RAND-Encumbered Patents unenforceable against Warner Bros.

## COUNTERCLAIM III
### (Promissory Estoppel)

309.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims as if fully set forth herein.

310.    As set forth above, Nokia made clear and definite promises to potential licensees through its commitments to the Coding Standards SSOs, their affiliates and members, and intended third-party beneficiaries, including Warner Bros., to offer to license on RAND terms to the RAND-Encumbered Patents.

311.    The intended purpose of Nokia's promises was to induce reliance upon these promises so that companies like Warner Bros. would invest substantial resources to design, develop, and produce products or services compatible with the relevant standards. Nokia knew or reasonably should have expected to know that it would induce reliance on these promises by companies such as Warner Bros.

312.    Warner Bros. developed and marketed its products and services in reliance on Nokia's promises, including making various products and services compliant with the Coding Standards.

313.    Nokia is estopped from reneging on these promises under the doctrine of promissory estoppel.

314.    Warner Bros. has been harmed as a result of its reasonable reliance on Nokia's promises. Warner Bros. has been forced to expend resources resolving this licensing dispute, including defending patent infringement claims and efforts to enjoin its products notwithstanding Warner Bros.' continuing willingness to take a license to Nokia's RAND-Encumbered Patents. Warner Bros. is threatened by the imminent loss of profits, loss of customers and potential customers, imposition of non-RAND terms and conditions, and loss of goodwill and product image. Warner Bros. faces, among other things, ongoing business uncertainties and litigation and mitigation expenses due to Nokia's litigation campaign and the possible threat of injunction in key foreign markets.

315.    Warner Bros. has suffered and will continue to suffer irreparable injury by reason of each and all of the acts, practices, and conduct alleged above until and unless the Court enjoins such acts, practices, and conduct.

316.    Moreover, Nokia's breach further constitutes waiver and/or estoppel of Nokia's rights to enforce the RAND-Encumbered Patents against any entity allegedly practicing the standard.

## COUNTERCLAIM IV
### (Breach of Duty of Good Faith)

317.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims as if fully set forth herein.

318.    As set forth above, through its statements and conduct, Nokia has express or implied contractual commitments with the Coding Standards SSOs and their respective members, affiliates, and/or intended third-party beneficiaries, including Warner Bros., to (1) abide by the

Patent Policy and Guidelines, and (2) offer to license on RAND terms the RAND-Encumbered Patents.

319.    Every party producing products or delivering services that support the Coding Standards, including Warner Bros., is an intended third-party beneficiary of Nokia's contractual commitments to the Coding Standards SSOs.

320.    As set forth above, Nokia breached its obligation to negotiate in good faith. Nokia refused to offer Warner Bros. a license on RAND terms to the RAND-Encumbered Patents, failed to negotiate and act in good faith, and launched a global litigation campaign that seeks to enjoin Warner Bros. from implementing H.264 and H.265 and to coerce Warner Bros. into capitulating and paying excessive, non-RAND royalties.

321.    As a result of Nokia's breach, Warner Bros. has been injured in its business or property. Nokia's refusal to offer a license to Warner Bros. on RAND terms and conditions has deprived Warner Bros. of its right to such a license, which has caused Warner Bros. to incur unnecessary costs and unwarranted harm, including but not limited to ongoing business uncertainties and litigation and mitigation expenses. The expedited injunctive relief that Nokia has sought in foreign jurisdictions is threatening Warner Bros. with immediate loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

322.    Warner Bros. has suffered damages, and will suffer further damages and irreparable harm, by reason of each and all of the acts, practices, breaches and conduct Warner Bros. alleges above until and unless the Court enjoins such acts, practices, and conduct.

## COUNTERCLAIM V
### (Declaratory Judgment of RAND-Encumbrance)

323.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims as if fully set forth herein.

324.    Nokia has insisted that it need not offer RAND licenses to its encoding patent claims because it contends its encoding technology can never be essential to the Coding Standards. Nokia's position that encoding is excluded from the Coding Standards contradicts, *inter alia*, the actual language of the Coding Standards (including their titles), the ITU's conformance specifications, Federal Circuit precedent, long-term industry consensus, Nokia's infringement contentions, Nokia's declarations of encoding-only patents as essential, Nokia's private statements, and Nokia's public statements about (F)RAND licensing.

325.    Nokia's position is further frustrated by the technology itself. Nokia has licensed its video coding patents—those that it has declared essential to the Coding Standards and those it has not—to device makers whose products decode videos that have been encoded according to the Coding Standards. Nokia asserts that those licenses are necessary to practice the Coding Standards. The licensed devices can only decode video compliant with the Coding Standards, thereby requiring video-content suppliers to conform to the Coding Standards. Nokia licensed the device makers to all video coding patents, including its declared video coding SEPs, under allegedly RAND licensing terms, but it now seeks to obtain a windfall by requiring further and supra-RAND royalties from video content suppliers on a per-subscriber or user basis. The devices are already licensed for their intended purpose but Nokia seeks to collect again from content providers on supra-RAND terms under the fiction that encoding is not part of the Coding Standards.

326.    Notwithstanding that Nokia routinely licenses all of its declared and undeclared video coding-related patents to device makers, it still insists that no one can use the Coding Standards to deliver video content to those devices without paying Nokia separately on a per-subscriber or user basis.

327.    Nokia seeks to coerce companies, like Warner Bros., that want to implement the Coding Standards to supply standard-compliant video to licensed devices. Nokia forces content suppliers into purchasing licenses to its video coding patents at exorbitant royalties. But the devices are already licensed to Nokia's video coding patents and therefore there is no need for an additional license.

328.    Left unredressed, Nokia's groundless interpretation of its RAND obligations would enable it to shrug off those commitments, subvert the purposes of standardization, impede the dissemination of standardized technology, and further its "hold up" scheme based on its false RAND promises and deliberate non-disclosure. The Coding Standards SSOs' purpose in requiring those promises and disclosures was to prevent exactly the type of patent-ambush strategy that Nokia is currently deploying against Warner Bros.

329.    Moreover, upon information and belief, even if Nokia's patents related to creating and delivering video content for devices compliant with the Coding Standards are found to be nonessential, Nokia's routine practice is to license all its video coding patents, including both its encoding and decoding claims, together in portfolio licenses regardless of whether they have been declared to Coding Standards SSOs or have been interpreted as essential under Coding Standards SSOs policies. As such, any offer of a license to a portion of those patents that may not be included in the standard or may not have been declared essential would be discriminatory and violate Nokia's RAND commitments on the declared and/or otherwise RAND-encumbered patents.

330.    Accordingly, there exists an actual and justiciable controversy with respect to whether Nokia's RAND promises encumber Nokia's encoding patent claims.

331.    A judicial declaration concerning the application of Nokia's RAND promises to the encoding patent claims is necessary and appropriate so that Warner Bros. can ascertain its rights

regarding those patent claims, and potentially bring other causes of action against Nokia to the extent the Court concludes that Nokia's RAND promises do not apply to its encoding patent claims.

## COUNTERCLAIM VI
### (Declaratory Judgment That Nokia Has Not Complied with Its RAND Obligations)

332.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims as if fully set forth herein.

333.    As set forth above, through its statements and conduct, Nokia has express or implied contractual commitments with the Coding Standards SSOs and their respective members, affiliates, and/or intended third-party beneficiaries, including Warner Bros., to (1) abide by the Patent Policy and Guidelines, and (2) offer to license on RAND terms the RAND-Encumbered Patents.

334.    Every party producing products or delivering services that support the Coding Standards, including Warner Bros., is an intended third-party beneficiary of Nokia's contractual commitments to the Coding Standards SSOs.

335.    As set forth above, Nokia has not complied with its contractual obligations by refusing to offer a license on RAND terms and instead choosing to engage in global litigation rather than good faith negotiation with Warner Bros. Specifically, Nokia has failed to provide Warner Bros. with RAND terms and conditions for a license to the RAND-Encumbered Patents.

336.    As a result of the acts described in the preceding paragraphs of Warner Bros.' Counterclaims, and particularly in view of Nokia's unwillingness to engage in good faith negotiations, there exists a substantial controversy of sufficient immediacy to warrant the issuance of a declaratory judgment.

337.    This dispute is of sufficient immediacy and reality to warrant the issue of a declaratory judgment.

338.    Warner Bros. requests a judicial declaration that Nokia has not complied with its contractual obligations to abide by the Patent Policy and Guidelines, and to offer to license the RAND-Encumbered Patents on RAND terms.

### COUNTERCLAIM VII
### (Declaration of Unenforceability Due To Late Disclosure Of IPR Declarations)

339.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims as if fully set forth herein.

340.    Upon information and belief, in violation of its obligations to Coding Standards SSOs, its members, and implementers, including Warner Bros., Nokia failed to timely disclose the Asserted Patents in accordance with the requirements of the Patent Policy. During development of the Coding Standards, Nokia employees attended meetings and submitted proposals for technology to be included in the Coding Standards. Despite its participation in these meetings, Nokia failed to disclose the existence of its patent rights during the development of the Coding Standards in a timely manner.

341.    These late disclosures breached the contractual duty that Nokia owed under the Patent Policy. Furthermore, these late disclosures constitute an implied waiver of Nokia's rights in the Asserted Patents as they relate to the Coding Standards, rendering them unenforceable against implementers of those standards.

342.    Nokia's repeated failure to disclose rights in the Asserted Patents to the Coding Standards SSOs—for years after the Coding Standards were frozen—is part of a pattern of egregious behavior that prevented the Coding Standards SSOs and their members from fully evaluating the relevant technologies when developing the Coding Standards. Upon information and belief, had the Asserted Patents been timely disclosed during the standard-setting process, members would have decided to standardize an alternative technology or left the relevant

technology out of the standard. The failure to disclose each of the Asserted Patents in a timely fashion distorted and impaired the standardization process in an egregious way.

343.    Nokia also benefited unjustly from this late disclosure. For example, Nokia now claims that implementers of the Coding Standards practice its patents, even though Nokia deprived Coding Standards SSOs members of the ability to consider non-patented alternatives or to eliminate the functionality from the standard that Nokia now claims is covered by the Asserted Patents, such that the accused functionality would not have been included in the Coding Standards but for the lack of timely disclosure. Nokia also has unjustly benefited from this late disclosure by demanding and obtaining licensing revenue based on the allegedly standards-essential nature of the Asserted Patents, by claiming enhanced value to investors and others through an inflated sense of its patent portfolio (which includes the Asserted Patents), and by alleging that Warner Bros. is infringing the Asserted Patents because it is implementing the Coding Standards.

344.    Nokia's misconduct in failing to timely disclose the Asserted Patents while the accused technologies were being adopted into the Coding Standards constitutes at least a waiver of its right to enforce its RAND-Encumbered Patents, including the Asserted Patents, against any entity practicing the Coding Standards, and renders the patents unenforceable against implementers of such standards.

## COUNTERCLAIM VIII
### (Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

345.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims as if fully set forth herein.

346.    By its acts, practices and conduct, Nokia has unlawfully monopolized each of the Relevant Technology Markets.

347.    Nokia commands monopoly power in the Relevant Technology Markets. It is now the sole supplier in those markets with a dominant market share; has excluded alternative providers of competing technology through its false RAND promises; and thereby acquired the power to impose supra-RAND prices and other non-RAND terms and conditions on implementers, including Warner Bros.

348.    There are significant barriers to entry in the Relevant Technology Markets that insulate Nokia's monopoly power. Entry into those markets is difficult, costly, and time-consuming. Barriers to entry include the need to make substantial, costly, and time-consuming investments in technology research and development. And the standardization process itself interposes a barrier to entry—rivals in the Relevant Technology Markets would have to undo decades' worth of standardization and lock-in to adopt an alternative to Nokia's standardized technology. Nokia works to erect further barriers to entry: in reneging on its RAND commitments, Nokia frustrates new entry and follow-on innovation.

349.    Nokia engaged and continues to engage in anticompetitive conduct that does not further competition on the merits and is reasonably capable of creating and sustaining monopoly power in the Relevant Technology Markets. As described earlier, Nokia deliberately failed to timely disclose its relevant patent rights and made intentionally false promises to the Coding Standards SSOs that it would license its patented video coding technologies on RAND terms. The Coding Standards SSOs and their membership relied on Nokia's non-disclosure and promises in choosing Nokia's technology for inclusion in new releases of the Coding Standards instead of (i) adopting competing alternative technologies, or (ii) declining to promulgate a standard or new releases at all.

350.    Nokia's deliberate non-disclosure and false RAND commitments induced the Coding Standards SSOs to adopt Nokia's patented technologies. Pursuant to paragraph 2.3 of the Patent Policy, the Coding Standards SSOs would not have considered Nokia's technologies for inclusion in the Coding Standards and their new releases if Nokia had disclosed its intention not to license on RAND terms, or revealed its plan to falsely promise to license on RAND terms and then renege on those commitments following adoption of its technology. Rather, the Coding Standards SSOs would have declined to adopt the Coding Standards and their new releases altogether, or relevant portions thereof, or it would have selected a competing alternative technology for adoption, per its Patent Policy.

351.    Nokia has harmed competition in the Relevant Technology Markets. Nokia's deliberate non-disclosure and deceptive promises to the Coding Standards SSOs during the process of adopting the Coding Standards and their new releases excluded alternative technologies, and obscured the costs of including its patented technologies in the new releases and versions, increasing the likelihood that the Coding Standards SSOs would continue including its patent rights and cement its monopoly power. Nokia's wrongful conduct in conjunction with the Coding Standards SSOs' standard-setting prevents Warner Bros. and other implementers from obtaining access to necessary technology in the Relevant Technology Markets on reasonable and non-discriminatory terms.

352.    As a consequence of Nokia's unlawful monopolization, customers in the Relevant Technology Markets, including Warner Bros., face higher costs for access to technologies necessary for the streaming of standardized video content than they would have paid but for Nokia's bait and switch, if they obtain them at all. Furthermore, customers in the Relevant Technology Markets, including Warner Bros., suffer anticompetitive injury because reasonable

substitutes have been excluded from the Relevant Technology Markets. As a further consequence, customers in the Relevant Technology Markets, including Warner Bros., have suffered anticompetitive injury because they have already made substantial investments in technologies that comply with features of the Coding Standards that Nokia now accuses. Due to Nokia's scheme, Warner Bros. and similar customers in the Relevant Technology Markets are now faced with either paying supra-RAND rates or abandoning their substantial investments.

353.    Nokia exerts leverage over implementers of the Coding Standards, like Warner Bros., that Nokia would not possess but for its deliberate non-disclosure and false promises to license on RAND terms and its unlawful acquisition of monopoly power in the Relevant Technology Markets. Because of that leverage, Warner Bros. and other implementers of the Coding Standards must either capitulate to Nokia's supra-RAND licensing demands or face the costs and risks of protracted global patent litigation and the corresponding threat of a loss of market access. The antitrust injury attributable to Nokia's overall anticompetitive scheme is not limited to the supra-RAND royalties and non-RAND conditions that Nokia attempts to extract from implementers, but it also includes the litigation fees and costs necessary to avoid the payment of supra-competitive licensing terms and exclusion from the marketplace.

354.    In the case of Warner Bros., the costs, duration, and threat of the foreign and domestic proceedings brought against it by Nokia have been substantial and have represented a significant additional cost to Warner Bros.' streaming business. Moreover, the threat of an injunction in significant foreign markets poses a major risk to Warner Bros.' global streaming business. Nokia's litigation tactics not only inflict antitrust injury on Warner Bros. in the form of the substantial costs of litigation, but they also threaten to erode Warner Bros.' global market share

for its streaming services, early-mover advantages including in foreign streaming markets, worldwide reputation, and customer goodwill.

355.    In addition, Warner Bros. has already incurred further costs to its streaming business by having to expend significant resources on engineering expenses as a direct result of Nokia's conduct, resources that Warner Bros. could otherwise spend on improving its products and services.

356.    In the absence of the injunctive relief requested herein, there is a substantial threat that Warner Bros. will be forced to capitulate to Nokia's supra-competitive and discriminatory licensing demands. The artificial imposition of higher costs on Warner Bros. threatens a further loss of market share, as does the threat of injunctions in foreign jurisdictions. In whatever way Nokia exploits its unlawfully-acquired monopoly power, the harm to Warner Bros. is both imminent and irreparable, because market share—once lost in the streaming market—may never be recovered.

357.    As a direct and proximate result of Nokia's unlawful monopolization, Warner Bros. has suffered and will suffer irreparable injury to its business and property and is threatened with additional harm in the form of the loss of customers and potential customers, the loss of product image and goodwill, and other irreparable harm to its streaming services. Nokia's exclusionary conduct has prevented Warner Bros. from obtaining access to necessary technology in the Relevant Technology Markets and, unless remedied, threatens to force Warner Bros. to capitulate to Nokia's demands.

358.    In addition to the harm to Warner Bros. and other implementers of the Coding Standards, Nokia's monopolistic conduct injures consumers of video streaming services and threatens them with further injury. Nokia's misconduct raises the cost of access to all products and

services that implement the Coding Standards. This unlawful tax on standard-compliant products drives up prices, reduces adoption of the Coding Standards, and hampers follow-on innovation.

359.    Furthermore, as Nokia and other holders of declared SEPs refuse to abide by their RAND commitments, the industry loses confidence and refuses to participate (or changes the way it participates) in procompetitive standard-setting processes, resulting in less standardization and its corresponding benefits. This too harms industry and end product consumers.

## COUNTERCLAIM IX
### (Declaratory Judgment of Patent Exhaustion)

360.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims as if fully set forth herein.

361.    Apple Inc. ("Apple") produces computers equipped with chips that provide "Hardware-accelerated H.264 [and] HEVC" encoding. Apple also produces the "Compressor" software that supports "encoding jobs for a broad range of industry-standard formats, including MPEG-2, H.264, [and] HEVC."

362.    On information and belief, Nokia has entered into a license agreement with Apple wherein Nokia has licensed its coding patents (including the Asserted Patents), to Apple. Apple, as an authorized licensee, sold products allegedly covered by Nokia's coding patents (including the Asserted Patents) to Warner Bros. without restrictions on resale or use.

363.    Furthermore, Amazon.com, Inc. ("Amazon") sells a web service called "AWS Elemental MediaConvert," which "is a file-based video processing service that allows video providers with any size content library to easily and reliably transcode on-demand content for broadcast and multiscreen delivery" and expressly "supports the AVC [and] HEVC . . . compression standards."

364.    On information and belief, Nokia has entered into a license agreement with Amazon wherein Nokia has licensed its coding patents (including the Asserted Patents) to Amazon. Amazon, as an authorized licensee, sold products allegedly covered by Nokia's coding patents (including the Asserted Patents) to Warner Bros. without restrictions on resale or use.

365.    Warner Bros. is entitled to a declaratory judgment that Nokia's patent rights regarding its coding patents (including the Asserted Patents) have been exhausted with respect to Warner Bros.' encoding of any H.264 or H.265 video using an Apple computer, Apple software, or an Amazon MediaConvert account.

366.    This dispute is of sufficient immediacy and reality to warrant the issue of a declaratory judgment because an actual controversy exists between Warner Bros. and Nokia as to whether Warner Bros. infringes the Asserted Patents (a representative subset of Nokia's coding patents), as Nokia contends, or does not do so, as Warner Bros. contends.

367.    Warner Bros. requests a judicial declaration that Nokia's patent rights regarding the coding patents (including the Asserted Patents) have been exhausted with respect to Warner Bros.' encoding of any H.264 or H.265 video using an Apple computer, Apple software, or an Amazon MediaConvert account due to an authorized first sale of a patented product.

## COUNTERCLAIM X
### (Declaratory Judgment of Express License)

368.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims as if fully set forth herein.

369.    On information and belief, Nokia has entered into a license agreement with Apple and Amazon wherein Nokia has licensed its coding patents (including the Asserted Patents) to Apple and Amazon. Apple and Amazon, as authorized licensees, sold products allegedly covered

by Nokia's coding patents (including the Asserted Patents) to Warner Bros. without restrictions on resale or use.

370.    Warner Bros. is entitled to a declaratory judgment that Nokia's patent rights regarding its coding patents (including the Asserted Patents) have been expressly licensed with respect to Warner Bros.' encoding of any H.264 or H.265 video using an Apple computer, Apple software, or an Amazon MediaConvert account.

371.    This dispute is of sufficient immediacy and reality to warrant the issue of a declaratory judgment because an actual controversy exists between Warner Bros. and Nokia as to whether Warner Bros. infringes the Asserted Patents (a representative subset of Nokia's coding patents) as Nokia contends, or does not do so, as Warner Bros. contends.

372.    Warner Bros. requests a judicial declaration that Warner Bros.' encoding of H.264 or H.265 video using an Apple computer, Apple software, or an Amazon MediaConvert account, is expressly licensed to Nokia's coding patents (including the Asserted Patents) under Nokia's license agreements with Apple and Amazon.

373.    In addition, on information and belief, Nokia has entered into license agreements with multiple third-party companies, including but not limited to, Apple, Amazon, Samsung, HP, and Lenovo, and other companies, that sell smartphones, tablets, computers, televisions, and/or other devices in the United States wherein Nokia licensed its coding patents (including the Asserted Patents) to those companies (the "Licensed Third Parties").

374.    Devices sold by the Licensed Third Parties are licensed to Nokia's coding patents (including the Asserted Patents) and include, and/or are used by consumers to run and stream videos using, for example, the Warner Bros. products, including HBO Max. Such licensed devices must receive H.264 or H.265 encoded video to use the expressly licensed Nokia patents. Therefore,

on information and belief, Warner Bros. products and any accused encoding of H.264 or H.265 video by Warner Bros. are expressly licensed to Nokia's coding patents (including the Asserted Patents) under Nokia's license agreements with the Licensed Third Parties.

375.    Warner Bros. is entitled to a declaratory judgment that Warner Bros. is expressly licensed to Nokia's coding patents (including the Asserted Patents) with respect to any use of Warner Bros. services and products by devices sold by the Licensed Third Parties.

376.    This dispute is of sufficient immediacy and reality to warrant the issue of a declaratory judgment because an actual controversy exists between Warner Bros. and Nokia as to whether Warner Bros. infringes Nokia's coding patents (including the Asserted Patents), as Nokia contends, or does not do so, as Warner Bros. contends.

377.    Warner Bros. requests a judicial declaration that Warner Bros. is expressly licensed to Nokia's coding patents (including the Asserted Patents) with respect to any use of the Warner Bros. products by devices sold by the Licensed Third Parties.

## COUNTERCLAIM XI
### (Declaratory Judgment of Implied License)

378.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims as if fully set forth herein.

379.    On information and belief, Nokia has entered into a license agreement with Apple and Amazon wherein Nokia has licensed its coding patents (including the Asserted Patents) to Apple and Amazon. Apple and Amazon, as authorized licensees, sold products allegedly covered by Nokia's coding patents (including the Asserted Patents) to Warner Bros. without restrictions on resale or use.

380.    Warner Bros. is entitled to a declaratory judgment that Nokia's patent rights regarding its coding patents (including the Asserted Patents) have been impliedly licensed with

respect to Warner Bros.' encoding of any H.264 or H.265 video using an Apple computer, Apple software, or an Amazon MediaConvert account.

381.    This dispute is of sufficient immediacy and reality to warrant the issue of a declaratory judgment because an actual controversy exists between Warner Bros. and Nokia as to whether Warner Bros. infringes the Asserted Patents (a representative subset of Nokia's coding patents), as Nokia contends, or does not do so, as Warner Bros. contends.

382.    Warner Bros. requests a judicial declaration that Warner Bros.' encoding of H.264 or H.265 video using an Apple computer, Apple software, or an Amazon MediaConvert account, is impliedly licensed to Nokia's coding patents (including the Asserted Patents) under Nokia's license agreements with Apple and Amazon.

383.    In addition, on information and belief, Nokia has entered into license agreements with multiple third-party companies, including but not limited to, Apple, Amazon, Samsung, HP, and Lenovo, and other companies, that sell smartphones, tablets, computers, televisions, and/or other devices in the United States wherein Nokia licensed its coding patents (including the Asserted Patents) to those companies (the "Licensed Third Parties").

384.    Devices sold by the Licensed Third Parties are licensed to Nokia's coding patents (including the Asserted Patents) and include, and/or are used by consumers to run and stream videos using, for example, the Warner Bros. products, including HBO Max. Such licensed devices must receive H.264 or H.265 encoded video to use the impliedly licensed Nokia patents. Therefore, on information and belief, Warner Bros.' products and any accused encoding of H.264 or H.265 video by Warner Bros. are impliedly licensed to Nokia's coding patents (including the Asserted Patents) under Nokia's license agreements with the Licensed Third Parties.

385.    Warner Bros. is entitled to a declaratory judgment that Warner Bros. is impliedly licensed to Nokia's coding patents (including the Asserted Patents) with respect to any use of Warner Bros. services and products by devices sold by the Licensed Third Parties.

386.    This dispute is of sufficient immediacy and reality to warrant the issue of a declaratory judgment because an actual controversy exists between Warner Bros. and Nokia as to whether Warner Bros. infringes Nokia's coding patents (including the Asserted Patents), as Nokia contends, or does not do so, as Warner Bros. contends.

387.    Warner Bros. requests a judicial declaration that Warner Bros. is impliedly licensed to Nokia's coding patents (including the Asserted Patents) with respect to any use of the Warner Bros. products by devices sold by the Licensed Third Parties.

## COUNTERCLAIM XII
### (Declaratory Judgment of Extraterritoriality)

388.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims as if fully set forth herein.

389.    Warner Bros. is entitled to and requests a declaratory judgment that digital distribution within the United States of video encoded outside of the United States, and digitally transmitted to servers within the United States, does not amount to conduct for which Nokia would be entitled to a remedy under United States law. Even if Nokia owns patent rights on methods of encoding, the resulting encoded digital video files are information, namely, a sequence of binary data (0s and 1s).

390.    Specifically, Warner Bros. requests a judicial declaration that such activities do not infringe any Nokia process claims directed at encoding under 35 U.S.C. § 271(a), because the activities do not amount to unauthorized making, using, offering to sell, or selling patented

inventions within the United States; nor is it importation into the United States of a patented invention.

391.    Furthermore, Warner Bros. requests a judicial declaration that such activities do not give rise to liability under 35 U.S.C. § 271(g) because the activities do not amount to importing into the United States or offering to sell, selling, or using within the United States a product which is made by a process patented in the United States. Digital video files are not products made by a process patented in the United States because they are not physical articles that were manufactured, but are rather, information that resulted from encoding processes performed outside of the United States.

392.    This dispute is of sufficient immediacy and reality to warrant the issue of a declaratory judgment because an actual controversy exists between Warner Bros. and Nokia as to whether Warner Bros. infringes the Asserted Patents (a representative subset of Nokia's coding patents), as Nokia contends, or does not do so, as Warner Bros. contends.

393.    Warner Bros. requests a judicial declaration that Nokia has no claims against it for digital video files produced via encoding performed outside of the United States and digitally transmitted into the United States.

## COUNTERCLAIM XIII
### (Declaratory Judgment of Invalidity of U.S. Patent No. 7,532,808)

394.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

395.    Plaintiff and Counterclaim Defendant Nokia Technologies Oy ("Nokia") alleges that one or more Accused Service infringes, directly or indirectly, the '808 Patent.

396.    By asserting its claims against Warner Bros. for infringement of the '808 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '808 Patent.

397.    One or more claims of the '808 Patent, including but not limited to claim 1, are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

398.    For example, and without limitation, the claims of the '808 Patent are invalid as obvious under 35 U.S.C. § 103 over at least one or more prior art references.

399.    Under 28 U.S.C. §§ 2201 and 2202, Warner Bros. is entitled to a declaratory judgment that the claims of the '808 Patent are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

400.    This is an exceptional case entitling Warner Bros. to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM XIV
### (Declaratory Judgment of Invalidity of U.S. Patent No. 6,950,469)

401.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

402.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '469 Patent.

403.    By asserting its claims against Warner Bros. for infringement of the '469 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '469 Patent.

404.    One or more claims of the '469 Patent, including but not limited to claim 1, are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

405.    For example, and without limitation, the claims of the '469 Patent are invalid as obvious under 35 U.S.C. § 103 over at least one or more prior art references.

406.    Under 28 U.S.C. §§ 2201 and 2202, Warner Bros. is entitled to a declaratory judgment that the claims of the '469 Patent are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

407.    This is an exceptional case entitling Warner Bros. to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM XV
### (Declaratory Judgment of Invalidity of U.S. Patent No. 8,175,148)

408.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

409.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '148 Patent.

410.    By asserting its claims against Warner Bros. for infringement of the '148 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '148 Patent.

411.    One or more claims of the '148 Patent, including but not limited to claim 1, are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

412.    For example, and without limitation, the claims of the '148 Patent are invalid as obvious under 35 U.S.C. § 103 over at least one or more prior art references.

413.    Under 28 U.S.C. §§ 2201 and 2202, Warner Bros. is entitled to a declaratory judgment that the claims of the '148 Patent are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

414.    This is an exceptional case entitling Warner Bros. to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM XVI
### (Declaratory Judgment of Invalidity of U.S. Patent No. 8,050,321)

415.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

416.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '321 Patent.

417.    By asserting its claims against Warner Bros. for infringement of the '321 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '321 Patent.

418.    One or more claims of the '321 Patent, including but not limited to claim 1, are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

419.    For example, and without limitation, the claims of the '321 Patent are invalid as obvious under 35 U.S.C. § 103 over at least one or more prior art references.

420.    Under 28 U.S.C. §§ 2201 and 2202, Warner Bros. is entitled to a declaratory judgment that the claims of the '321 Patent are invalid for failure to comply with one or more of

the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

421.    This is an exceptional case entitling Warner Bros. to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM XVII
### (Declaratory Judgment of Invalidity of U.S. Patent No. 7,289,674)

422.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

423.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '674 Patent.

424.    By asserting its claims against Warner Bros. for infringement of the '674 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '674 Patent.

425.    One or more claims of the '674 Patent, including but not limited to claim 1, are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

426.    For example, and without limitation, the claims of the '674 Patent are invalid as obvious under 35 U.S.C. § 103 over at least one or more prior art references.

427.    Under 28 U.S.C. §§ 2201 and 2202, Warner Bros. is entitled to a declaratory judgment that the claims of the '674 Patent are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

428.    This is an exceptional case entitling Warner Bros. to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM XVIII
### (Declaratory Judgment of Invalidity of U.S. Patent No. 6,968,005)

429.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

430.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '005 Patent.

431.    By asserting its claims against Warner Bros. for infringement of the '005 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '005 Patent.

432.    One or more claims of the '005 Patent, including but not limited to claim 1, are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

433.    For example, and without limitation, the claims of the '005 Patent are invalid as obvious under 35 U.S.C. § 103 over at least one or more prior art references.

434.    Under 28 U.S.C. §§ 2201 and 2202, Warner Bros. is entitled to a declaratory judgment that the claims of the '005 Patent are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

435.    This is an exceptional case entitling Warner Bros. to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM XIX
### (Declaratory Judgment of Invalidity of U.S. Patent No. 6,711,211)

436.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

437.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '211 Patent.

438.    By asserting its claims against Warner Bros. for infringement of the '211 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '211 Patent.

439.    One or more claims of the '211 Patent, including but not limited to claim 1, are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

440.    For example, and without limitation, the claims of the '211 Patent are invalid as obvious under 35 U.S.C. § 103 over at least one or more prior art references.

441.    Under 28 U.S.C. §§ 2201 and 2202, Warner Bros. is entitled to a declaratory judgment that the claims of the '211 Patent are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

442.    This is an exceptional case entitling Warner Bros. to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

**COUNTERCLAIM XX**
**(Declaratory Judgment of Invalidity of U.S. Patent No. 8,005,145)**

443.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

444.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '145 Patent.

445.    By asserting its claims against Warner Bros. for infringement of the '145 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '145 Patent.

446.    One or more claims of the '145 Patent, including but not limited to claim 1, are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

447.    For example, and without limitation, the claims of the '145 Patent are invalid as obvious under 35 U.S.C. § 103 over at least one or more prior art references.

448.    Under 28 U.S.C. §§ 2201 and 2202, Warner Bros. is entitled to a declaratory judgment that the claims of the '145 Patent are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

449.    This is an exceptional case entitling Warner Bros. to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

### COUNTERCLAIM XXI
### (Declaratory Judgment of Invalidity of U.S. Patent No. 9,800,891)

450.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

451.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '891 Patent.

452.    By asserting its claims against Warner Bros. for infringement of the '891 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '891 Patent.

453.    One or more claims of the '891 Patent, including but not limited to claim 23, are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

454.    For example, and without limitation, the claims of the '891 Patent are invalid as obvious under 35 U.S.C. § 103 over at least one or more prior art references.

455.    Under 28 U.S.C. §§ 2201 and 2202, Warner Bros. is entitled to a declaratory judgment that the claims of the '891 Patent are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

456.    This is an exceptional case entitling Warner Bros. to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM XXII
### (Declaratory Judgment of Invalidity of U.S. Patent No. 6,856,701)

457.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

458.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '701 Patent.

459.    By asserting its claims against Warner Bros. for infringement of the '701 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '701 Patent.

460.    One or more claims of the '701 Patent, including but not limited to claim 1, are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

461.    For example, and without limitation, the claims of the '701 Patent are invalid as obvious under 35 U.S.C. § 103 over at least one or more prior art references.

462.    Under 28 U.S.C. §§ 2201 and 2202, Warner Bros. is entitled to a declaratory judgment that the claims of the '701 Patent are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

463.    This is an exceptional case entitling Warner Bros. to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM XXIII
### (Declaratory Judgment of Invalidity of U.S. Patent No. 8,107,744)

464.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

465.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '744 Patent.

466.    By asserting its claims against Warner Bros. for infringement of the '744 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '744 Patent.

467.    One or more claims of the '744 Patent, including but not limited to claim 12, are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

468.    For example, and without limitation, the claims of the '744 Patent are invalid as obvious under 35 U.S.C. § 103 over at least one or more prior art references.

469.    Under 28 U.S.C. §§ 2201 and 2202, Warner Bros. is entitled to a declaratory judgment that the claims of the '744 Patent are invalid for failure to comply with one or more of

the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

470.    This is an exceptional case entitling Warner Bros. to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

**COUNTERCLAIM XXIV**
**(Declaratory Judgment of Invalidity of U.S. Patent No. 9,571,833)**

471.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

472.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '833 Patent.

473.    By asserting its claims against Warner Bros. for infringement of the '833 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '833 Patent.

474.    One or more claims of the '833 Patent, including but not limited to claim 1, are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

475.    For example, and without limitation, the claims of the '833 Patent are invalid as obvious under 35 U.S.C. § 103 over at least one or more prior art references.

476.    Under 28 U.S.C. §§ 2201 and 2202, Warner Bros. is entitled to a declaratory judgment that the claims of the '833 Patent are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

477.    This is an exceptional case entitling Warner Bros. to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM XXV
### (Declaratory Judgment of Invalidity of U.S. Patent No. 10,523,960)

478.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

479.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '960 Patent.

480.    By asserting its claims against Warner Bros. for infringement of the '960 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '960 Patent.

481.    One or more claims of the '960 Patent, including but not limited to claim 1, are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

482.    For example, and without limitation, the claims of the '960 Patent are invalid as obvious under 35 U.S.C. § 103 over at least one or more prior art references.

483.    Under 28 U.S.C. §§ 2201 and 2202, Warner Bros. is entitled to a declaratory judgment that the claims of the '960 Patent are invalid for failure to comply with one or more of the requirements for patentability set forth in Title 35 of the U.S. Code, including without limitation §§ 101, 102, 103, and/or 112.

484.    This is an exceptional case entitling Warner Bros. to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM XXVI
### (Declaratory Judgment of Non-Infringement of U.S. Patent No. 7,532,808)

485.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

486.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '808 Patent, including at least claim 1.

487.    Warner Bros. has not directly or indirectly infringed, contributed to or induced infringement of any valid or enforceable claim of the '808 Patent and has not otherwise committed any acts in violation of 35 U.S.C. § 271.

488.    By asserting its claims against Warner Bros. for infringement of the '808 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '808 Patent.

489.    Counterclaim Plaintiffs therefore seek a declaration that they have not infringed, and do not infringe, literally or under the doctrine of equivalents, directly or indirectly, any valid and enforceable claim of the '808 Patent.

490.    This is an exceptional case entitling Counterclaim Plaintiffs to an award of their attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM XXVII
### (Declaratory Judgment of Non-Infringement of U.S. Patent No. 6,950,469)

491.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

492.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '469 Patent, including at least claim 1.

493.    Warner Bros. has not directly or indirectly infringed, contributed to or induced infringement of any valid or enforceable claim of the '469 Patent and has not otherwise committed any acts in violation of 35 U.S.C. § 271.

494.    By asserting its claims against Warner Bros. for infringement of the '469 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '469 Patent.

495.    Counterclaim Plaintiffs therefore seek a declaration that they have not infringed, and do not infringe, literally or under the doctrine of equivalents, directly or indirectly, any valid and enforceable claim of the '469 Patent.

496.    This is an exceptional case entitling Counterclaim Plaintiffs to an award of their attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM XXVIII
### (Declaratory Judgment of Non-Infringement of U.S. Patent No. 8,175,148)

497.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

498.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '148 Patent, including at least claim 1.

499.    Warner Bros. has not directly or indirectly infringed, contributed to or induced infringement of any valid or enforceable claim of the '148 Patent and has not otherwise committed any acts in violation of 35 U.S.C. § 271.

500.    By asserting its claims against Warner Bros. for infringement of the '148 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '148 Patent.

501.    Counterclaim Plaintiffs therefore seek a declaration that they have not infringed, and do not infringe, literally or under the doctrine of equivalents, directly or indirectly, any valid and enforceable claim of the '148 Patent.

502.    This is an exceptional case entitling Counterclaim Plaintiffs to an award of their attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM XXIX
### (Declaratory Judgment of Non-Infringement of U.S. Patent No. 8,050,321)

503.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

504.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '321 Patent, including at least claim 1.

505.    Warner Bros. has not directly or indirectly infringed, contributed to or induced infringement of any valid or enforceable claim of the '321 Patent and has not otherwise committed any acts in violation of 35 U.S.C. § 271.

506.    By asserting its claims against Warner Bros. for infringement of the '321 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '321 Patent.

507.    Counterclaim Plaintiffs therefore seek a declaration that they have not infringed, and do not infringe, literally or under the doctrine of equivalents, directly or indirectly, any valid and enforceable claim of the '321 Patent.

508.    This is an exceptional case entitling Counterclaim Plaintiffs to an award of their attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM XXX
### (Declaratory Judgment of Non-Infringement of U.S. Patent No. 7,289,674)

509.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

510.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '674 Patent, including at least claim 1.

511.    Warner Bros. has not directly or indirectly infringed, contributed to or induced infringement of any valid or enforceable claim of the '674 Patent and has not otherwise committed any acts in violation of 35 U.S.C. § 271.

512.    By asserting its claims against Warner Bros. for infringement of the '674 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '674 Patent.

513.    Counterclaim Plaintiffs therefore seek a declaration that they have not infringed, and do not infringe, literally or under the doctrine of equivalents, directly or indirectly, any valid and enforceable claim of the '674 Patent.

514.    This is an exceptional case entitling Counterclaim Plaintiffs to an award of their attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM XXXI
### (Declaratory Judgment of Non-Infringement of U.S. Patent No. 6,968,005)

515.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

516.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '005 Patent, including at least claim 1.

517.    Warner Bros. has not directly or indirectly infringed, contributed to or induced infringement of any valid or enforceable claim of the '005 Patent and has not otherwise committed any acts in violation of 35 U.S.C. § 271.

518.    By asserting its claims against Warner Bros. for infringement of the '005 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '005 Patent.

519.    Counterclaim Plaintiffs therefore seek a declaration that they have not infringed, and do not infringe, literally or under the doctrine of equivalents, directly or indirectly, any valid and enforceable claim of the '005 Patent.

520.    This is an exceptional case entitling Counterclaim Plaintiffs to an award of their attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM XXXII
### (Declaratory Judgment of Non-Infringement of U.S. Patent No. 6,711,211)

521.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

522.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '211 Patent, including at least claim 1.

523.    Warner Bros. has not directly or indirectly infringed, contributed to or induced infringement of any valid or enforceable claim of the '211 Patent and has not otherwise committed any acts in violation of 35 U.S.C. § 271.

524.    By asserting its claims against Warner Bros. for infringement of the '211 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '211 Patent.

525.    Counterclaim Plaintiffs therefore seek a declaration that they have not infringed, and do not infringe, literally or under the doctrine of equivalents, directly or indirectly, any valid and enforceable claim of the '211 Patent.

526.    This is an exceptional case entitling Counterclaim Plaintiffs to an award of their attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM XXXIII
### (Declaratory Judgment of Non-Infringement of U.S. Patent No. 8,005,145)

527.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

528.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '145 Patent, including at least claim 1.

529.    Warner Bros. has not directly or indirectly infringed, contributed to or induced infringement of any valid or enforceable claim of the '145 Patent and has not otherwise committed any acts in violation of 35 U.S.C. § 271.

530.    By asserting its claims against Warner Bros. for infringement of the '145 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '145 Patent.

531.    Counterclaim Plaintiffs therefore seek a declaration that they have not infringed, and do not infringe, literally or under the doctrine of equivalents, directly or indirectly, any valid and enforceable claim of the '145 Patent.

532.    This is an exceptional case entitling Counterclaim Plaintiffs to an award of their attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM XXXIV
### (Declaratory Judgment of Non-Infringement of U.S. Patent No. 9,800,891)

533.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

534.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '891 Patent, including at least claim 23.

535.    Warner Bros. has not directly or indirectly infringed, contributed to or induced infringement of any valid or enforceable claim of the '891 Patent and has not otherwise committed any acts in violation of 35 U.S.C. § 271.

536.    By asserting its claims against Warner Bros. for infringement of the '891 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '891 Patent.

537.    Counterclaim Plaintiffs therefore seek a declaration that they have not infringed, and do not infringe, literally or under the doctrine of equivalents, directly or indirectly, any valid and enforceable claim of the '891 Patent.

538.    This is an exceptional case entitling Counterclaim Plaintiffs to an award of their attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM XXXV
### (Declaratory Judgment of Non-Infringement of U.S. Patent No. 6,856,701)

539.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

540.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '701 Patent, including at least claim 1.

541.    Warner Bros. has not directly or indirectly infringed, contributed to or induced infringement of any valid or enforceable claim of the '701 Patent and has not otherwise committed any acts in violation of 35 U.S.C. § 271.

542.    By asserting its claims against Warner Bros. for infringement of the '701 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '701 Patent.

543.    Counterclaim Plaintiffs therefore seek a declaration that they have not infringed, and do not infringe, literally or under the doctrine of equivalents, directly or indirectly, any valid and enforceable claim of the '701 Patent.

544.    This is an exceptional case entitling Counterclaim Plaintiffs to an award of their attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

**COUNTERCLAIM XXXVI**
**(Declaratory Judgment of Non-Infringement of U.S. Patent No. 8,107,744)**

545.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

546.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '744 Patent, including at least claim 12.

547.    Warner Bros. has not directly or indirectly infringed, contributed to or induced infringement of any valid or enforceable claim of the '744 Patent and has not otherwise committed any acts in violation of 35 U.S.C. § 271.

548.    By asserting its claims against Warner Bros. for infringement of the '744 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '744 Patent.

549.    Counterclaim Plaintiffs therefore seek a declaration that they have not infringed, and do not infringe, literally or under the doctrine of equivalents, directly or indirectly, any valid and enforceable claim of the '744 Patent.

550.    This is an exceptional case entitling Counterclaim Plaintiffs to an award of their attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM XXXVII
### (Declaratory Judgment of Non-Infringement of U.S. Patent No. 9,571,833)

551.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

552.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '833 Patent, including at least claim 1.

553.    Warner Bros. has not directly or indirectly infringed, contributed to or induced infringement of any valid or enforceable claim of the '833 Patent and has not otherwise committed any acts in violation of 35 U.S.C. § 271.

554.    By asserting its claims against Warner Bros. for infringement of the '833 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '833 Patent.

555.    Counterclaim Plaintiffs therefore seek a declaration that they have not infringed, and do not infringe, literally or under the doctrine of equivalents, directly or indirectly, any valid and enforceable claim of the '833 Patent.

556.    This is an exceptional case entitling Counterclaim Plaintiffs to an award of their attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM XXXVIII
### (Declaratory Judgment of Non-Infringement of U.S. Patent No. 10,523,960)

557.    Warner Bros. realleges and incorporates by reference the allegations set forth in the preceding paragraphs of its Counterclaims, as if entirely set forth herein.

558.    Nokia alleges that one or more Accused Service infringes, directly or indirectly, the '960 Patent, including at least claim 1.

559.    Warner Bros. has not directly or indirectly infringed, contributed to or induced infringement of any valid or enforceable claim of the '960 Patent and has not otherwise committed any acts in violation of 35 U.S.C. § 271.

560.    By asserting its claims against Warner Bros. for infringement of the '960 Patent, Nokia has created an actual, substantial, and continuing justiciable controversy regarding the infringement of the claims of the '960 Patent.

561.    Counterclaim Plaintiffs therefore seek a declaration that they have not infringed, and do not infringe, literally or under the doctrine of equivalents, directly or indirectly, any valid and enforceable claim of the '960 Patent.

562.    This is an exceptional case entitling Counterclaim Plaintiffs to an award of their attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## JURY DEMAND

563.    Counterclaim Plaintiffs request a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Warner Bros. respectfully requests that this Court enter the following relief in its favor and against Nokia, as follows:

1.    Judgment in favor of Warner Bros. and against Nokia;

2.    A declaration that Nokia has monopolized the Relevant Technology Markets in violation of Section 2 of the Sherman Act;

3.    A judgment that Nokia is liable for breach of contract, breach of its duty of good faith, and promissory estoppel;

4.    A judgment that Nokia is liable for common law fraud;

5.    A judgment and declaration that Nokia's RAND promises apply with equal force to Nokia's encoding patent claims;

6.      A judgment enjoining Nokia from conduct inconsistent with its RAND obligations;

7.      A judgment and declaration that each of Nokia's U.S. patents declared by it to be essential to the Coding Standards is unenforceable;

8.      A declaration that each of Nokia's U.S. patents that are in fact essential to the Coding Standards, even if undeclared, is unenforceable;

9.      A judgment and declaration that Nokia's patent rights regarding its coding patents have been exhausted with respect to Warner Bros.' encoding of any H.264 or H.265 video using an Apple computer, Apple software, or an Amazon MediaConvert account;

10.     A judgment and declaration that Nokia's patent rights regarding its coding patents have been expressly licensed with respect to Warner Bros.' encoding of any H.264 or H.265 video using an Apple computer, Apple software, or an Amazon MediaConvert account;

11.     A judgment and declaration that Nokia's patent rights regarding its coding patents have been impliedly licensed with respect to Warner Bros.' encoding of any H.264 or H.265 video using an Apple computer, Apple software, or an Amazon MediaConvert account;

12.     A judgment and declaration that Warner Bros. is expressly licensed to Nokia's coding patents with respect to any use of Warner Bros. services by devices sold by Licensed Third Parties;

13.     A judgment and declaration that Warner Bros. is impliedly licensed to Nokia's coding patents with respect to any use of Warner Bros. services by devices sold by Licensed Third Parties;

14.     A judgment and declaration that Nokia has no claims against it for digital video files produced via encoding performed outside of the United States and digitally transmitted into the United States;

15.     That Nokia takes nothing by way of its Complaint and the same be dismissed with prejudice;

16.     A declaration that Warner Bros. Defendants/Counterclaim Plaintiffs do not infringe and have not infringed any claim of the Asserted Patents;

17.     A declaration that the claims of the Asserted Patents are invalid;

18.     That all damages, costs, expenses, attorneys' fees, pre-judgment and/or post-judgment interest, and other relief sought by Plaintiff be denied;

19.     That this case be declared exceptional pursuant to 35 U.S.C. § 285 and attorneys' fees and costs incurred in this action be awarded to Warner Bros.;

20.     A judgment granting Warner Bros. injunctive relief consistent with the determinations in this case;

21.     An award of treble Warner Bros.' damages, in an amount to be proven at trial, caused by Nokia's monopolistic and anticompetitive conduct;

22.     An award of Warner Bros.' compensatory and punitive damages, in an amount to be proven at trial, for Nokia's common law fraud;

23.     An award of Warner Bros.' damages, in an amount to be proven at trial, for Nokia's breach of contract, breach of its duty of good faith, and promissory estoppel;

24.     A judgment awarding Warner Bros. damages and pre-judgment and post-judgment interest;

25.     An order granting Warner Bros. its attorneys' fees and costs in this case;

26.     An award to Warner Bros. of any attorneys' fees and costs incurred in responding to and defending actions filed by Nokia seeking injunctive relief in foreign courts; and

27.     Such other and further relief as the Court deems just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jying@morrisnichols.com

OF COUNSEL:

Jason T. Lao
Kenneth G. Parker
David Z. Kahn
Kamden Segawa
Kayla Shojai
HAYNES AND BOONE, LLP
600 Anton Boulevard, Suite 700
Costa Mesa, CA 92626
(949) 202-3000

Brian C. Kwok
HAYNES AND BOONE, LLP
1 Post Street, Suite 2800
San Francisco, CA 94104
(415) 293-8900

Tiffany Cooke
HAYNES AND BOONE, LLP
675 15th Street, Suite 2200
Denver, CO 80202
(303) 382-6200

*Attorneys for Defendants*

December 30, 2025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 30, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on December 30, 2025, upon the following in the manner indicated:

Michael J. Farnan                                   *VIA ELECTRONIC MAIL*
Brian E. Farnan
FARNAN LLP
919 Borth Market St, 12th Floor
Wilmington, DE 19801
*Attorneys for Plaintiff*

Warren Lipschitz                                    *VIA ELECTRONIC MAIL*
Erik Fountain
Alexander J. Chern
Kyra Cooper
MCKOOL SMITH, P.C.
300 Crescent Court Suite 1500
Dallas, TX 75201
*Attorneys for Plaintiff*

R. Mitch Verboncoeur                                *VIA ELECTRONIC MAIL*
Joshua Budwin
MCKOOL SMITH, P.C.
303 Colorado Street, Suite 2100
Austin, TX 78701
*Attorneys for Plaintiff*


*/s/ Jennifer Ying*
_____
Jennifer Ying (#5550)